# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

VALDAMIR FRED MORELOS,
Defendant and Appellant.

S051968

Santa Clara County Superior Court
169362

August 11, 2022

Justice Groban authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Kruger, Jenkins, and Guerrero concurred.

Justice Liu filed a dissenting opinion.

PEOPLE v. MORELOS

S051968

Opinion of the Court by Groban, J.

Following a bench trial, Valdamir Fred Morelos was convicted of Kurt Anderson's first degree murder. (Pen. Code,[1] § 187.) The trial court found true that Morelos used a firearm in the commission of the murder (§§ 12022.5, subd. (a), 1203.06) and that three special circumstance allegations applied: murder in the commission or attempted commission of robbery (§ 190.2, subd. (a)(17)(A)); murder in the commission or attempted commission of specified sexual acts (sodomy and oral copulation) (§ 190.2, subd. (a)(7)(D), (F)); and intentional murder involving the infliction of torture (§ 190.2, subd. (a)(18)). The trial court further found true two prior serious felony enhancements (§ 667, subd. (a)) and two prior prison term enhancements (§ 667.5).

After a penalty phase bench trial, the trial court returned a verdict of death, and imposed that sentence. The court also imposed a consecutive prison term of 15 years, consisting of five years each for the firearm and two prior serious felony enhancements. The sentences for the prior prison terms under section 667.5, subdivisions (a) (three-year enhancement) and (b) (one-year enhancement) were stayed pursuant to section 654. This appeal is automatic. (§ 1239, subd. (b).)

_____

[1]    All further undesignated statutory references are to the Penal Code.

1

We affirm the trial court's guilt determination, except as modified to strike the prior prison term enhancement under section 667.5, subdivision (b). We affirm the judgment of death. The prison sentence is vacated, and the matter is remanded for the trial court to consider whether to exercise its newly conferred discretion under Senate Bill Nos. 620 (2017–2018 Reg. Sess.) and 1393 (2017–2018 Reg. Sess.) to strike the firearm and prior serious felony enhancements, respectively.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. Guilt Phase Evidence

Morelos waived jury at both the guilt and penalty phases. The guilt phase of the bench trial commenced on January 3, 1996. The prosecution presented evidence that Morelos forcibly sodomized, tortured, and murdered Anderson. Morelos, representing himself, testified at the guilt phase.

Neal Picklesimer, Morelos's former roommate, testified that, on October 17, 1992, he picked Morelos up from the Arena Hotel in San Jose, where Morelos was staying. The two went to several gay bars in San Jose: Renegades, Gregg's, Bucks, and Tinker's Damn. About an hour before closing time, the two left Tinker's Damn and went back to Renegades. Before Picklesimer left the bar, Morelos and Picklesimer made plans to get together the next day to see the air show at Moffett Field. On October 18, 1992, Picklesimer and Morelos attended the air show and Picklesimer dropped Morelos back off at the Arena Hotel between 10:00 p.m. and 11:00 p.m.

Morelos testified that, after Picklesimer dropped him off at the Arena Hotel, he went to Renegades with the goal of robbing someone to obtain transportation and money. He was armed with two firearms, a .45 and a .38, as well as a knife.

Morelos met Anderson at Renegades and told Anderson he wanted to show him something. Morelos took Anderson to an enclosed area, showed him the guns, and told Anderson to leave with him. Morelos testified that he intended to get as much money as he could out of Anderson and stated that Anderson owed him about $40. Morelos had Anderson drive him to the Arena Hotel, where he then took the keys to Anderson's Jeep and led Anderson back to his room. Morelos instructed Anderson to take his clothes off, then gagged and tied Anderson up using the sheets and towels from the hotel room. Morelos took Anderson's wallet, watch, and ATM card. Then Morelos sexually assaulted Anderson for approximately 45 minutes, penetrating his anus and mouth and forcing Anderson to orally copulate him. Morelos testified that he tied Anderson's hands behind his back and kept a knife drawn against Anderson in case Anderson tried to assault him.

Several hours later, Morelos hog-tied Anderson's feet and hands together and then used a strip of cloth to tie Anderson's feet to his neck. Morelos tied another piece of cloth around Anderson's neck and secured that to the ceiling fan. Then Morelos tied strips of cloth around Anderson's testicles and tied them to the ceiling fan in order to inflict extreme pain to force Anderson to give him the correct personal identification number for his ATM card. After getting Anderson's personal identification number, Morelos gagged and blindfolded Anderson and left the hotel room.

Morelos testified that he briefly left Anderson in the hotel room to access a nearby ATM machine. Although Anderson had two accounts, a checking and a savings account, both were low on funds and Morelos ultimately did not bother wasting his time

to get money out of the accounts. He was extremely angry when he found out Anderson did not have any money.

Morelos went back to the hotel room, took the gag and blindfold off Anderson, then yanked the bindings on Anderson's neck and testicles while questioning and hitting Anderson. Anderson said the money in his bank accounts must have gone to rent through automatic transfer. Morelos testified that he was then done with Anderson, so at around 4:00 a.m. on October 19th, Morelos dressed Anderson in a pair of jeans and a T-shirt, walked him outside, and then down to the Jeep. Armed with the three guns and extra ammunition, Morelos drove Anderson up to Mount Hamilton Road. Morelos told Anderson he was going to tie Anderson to a tree and leave him there. When Morelos found a bushy, camouflaged area, he directed Anderson in that direction then told him to stop. Morelos explained to Anderson that he was not going to tie Anderson to a tree so that Anderson would believe he was going to be set free. Then Morelos shot Anderson in the head. Morelos testified that the gunshot did not kill Anderson; he fell down but was still alive. So Morelos shot him again, but the second shot did not kill Anderson. Morelos left Anderson there, reasoning that he would die eventually.

Morelos's sister testified that, at approximately 6:00 a.m. on October 19, 1992, Morelos drove to her house in a brown Jeep and told her that he had shot and killed someone. He told her that he had been in a motel with a man, tied him up, tied something around the man's genitals, and tied him to a ceiling fan. At first she did not believe him but then he showed her a handgun. Morelos told his sister that he had two guns, money, and the Jeep belonging to the man he killed. Morelos also told her that he shot the man behind the head somewhere up in the

4

hills where they would never find the body. His sister, a probationer, told Morelos that she was expecting a visit from her probation officer and instructed him to leave.

According to Picklesimer's testimony, Morelos then called Picklesimer and asked if he could stay with Picklesimer for a while and Picklesimer agreed. When Picklesimer got home that night, Morelos was spray painting a Jeep black. Morelos told Picklesimer that he had picked up someone at a bar the night before, went back to his hotel room and had sex with him. Morelos described tying this person up, tying him to a ceiling fan, taking his ATM card and trying to get money from the ATM card. Morelos said that early the next morning he untied the man from the ropes and tied his hands behind his back, then took him in the Jeep up into the hills. Morelos told Picklesimer that the man was crying and pleading for his life and that Morelos shot him in the head. The man fell to the ground but was still alive, so Morelos shot him again. Morelos showed Picklesimer three guns he had in his possession: a .45 automatic pistol, a .357 revolver, and a small revolver. He also showed Picklesimer a Halston watch that Morelos said belonged to the man.

The next morning, on October 20, 1992, Picklesimer called Menlo Park Police to report what Morelos had told him. An officer spoke with Picklesimer and then told him that the Santa Clara Police Department had jurisdiction. Picklesimer spoke with Sergeant Zaragoza at the Santa Clara Police Department and did a drive by of his home with officers. Officers waited outside Picklesimer's house and Morelos was arrested when he returned to Picklesimer's home in the Jeep. When officers searched Morelos at booking they found an ATM card with the name of Kurt Anderson.

Before interviewing Morelos, law enforcement officers informed him of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. Morelos waived his rights and signed a *Miranda* waiver. His confession was audio and video recorded. Portions of the videotaped confession and the audio tapes of Morelos's interview were played at trial. Morelos directed officers to the site of the murder, approximately six miles southeast of Alum Rock Avenue on Mount Hamilton Road. There, officers recovered Anderson's body. Officers found .45-caliber cartridge casings and slugs near Anderson's body.

Forensic pathologist Dr. Parviz Pakdaman, who performed the autopsy on Anderson, testified that there was bruising on the shaft of Anderson's penis and on his scrotum. He further testified that a hard projectile entered Anderson's head and caused massive destruction to his brain. Soot and powder surrounded the entrance wound, indicating that the projectile was fired from a very close range, less than one inch from the skull.

Morelos testified as to his prior convictions. He was convicted in 1988 of robbery (§ 211) and first degree burglary (§§ 459, 460.1), for which he was sentenced to five years four months in prison. Morelos was also convicted of assault with a deadly weapon and infliction of great bodily injury for a stabbing he committed in the California Youth Authority (CYA) and was sentenced to three years in prison.

The trial court found Morelos guilty of the first degree murder of Anderson, and found true the personal use of a firearm allegation. The court also found true the special circumstance, prior conviction, and prior prison term allegations.

### B. Penalty Phase Evidence

The penalty phase bench trial commenced on January 10, 1996.

The People called several witnesses to testify. John E. testified regarding an incident with Morelos that occurred on or about March 9, 1988. John E. and Morelos had been in a relationship and living together and Morelos wanted another man to move into their trailer. John E. refused and Morelos assaulted John E., hitting him in the face repeatedly. John E. required over 300 stitches for the injuries Morelos caused. Morelos stole money from John E. and the friend John E. was staying with, and also stole John E.'s television. John E. reported the incident to the police and Morelos was eventually convicted of robbery and first degree burglary.

Thomas S. testified that Morelos hit him over the head with a baseball bat, causing a concussion and eight lacerations that each required six to 14 stitches. Harold T. also testified that Morelos picked up the bat and hit Thomas S., splitting his head open. The assault was not prosecuted.

Timothy F. testified that Morelos offered to orally copulate him and, when he refused, Morelos threatened him with a knife and told him that he had "raped guys before" and would do it again.

R.G., a San Jose Police Sergeant, testified that Morelos shot at him and his partner in 1977, when Morelos was about 16 years old.

Robert L. testified that he rented a room from Morelos's mother in 1992. Morelos forcibly sodomized Robert L. and did so with several guns within his reach.

Kenneth M. testified that Morelos nearly hit him while driving a getaway vehicle for a woman who had shoplifted from the store where Kenneth M. worked as security. Morelos drove the vehicle directly towards Kenneth M. and attempted to run him down. Had Kenneth M. not jumped behind a pole, Morelos would have hit him with the vehicle.

James C. testified that Morelos sexually assaulted him in 1992. Morelos stripped him of his clothes and locked him in his bedroom for six hours. Morelos hit James C. in the face and twisted his arm behind his back, threatening to break it. Morelos forcibly sodomized James C. and forced James C. to orally copulate him. Morelos later went to James C.'s home and demanded that he return a clock. Morelos repeatedly threatened to kill James C.

Morelos only called one witness to testify before his own testimony. He recalled John E. to the stand, for whom he had previously reserved cross-examination. Morelos elicited testimony about an incident between himself and a person nicknamed "Danger" that occurred in the garage at John E.'s grandmother's house. John E. witnessed Morelos and Danger sparring in the garage before leaving the two alone. The next day, Morelos told John E. he had forced himself on Danger. John E. also confirmed that his trailer was broken into after the assault by Morelos about which he had previously testified. John E. also remembered Morelos selling drugs at the Arena Hotel.

Morelos testified and provided a narrative history of his life, describing running away from home as a child, the marital problems between his mother and her husband, his father's drinking problems, and his time in juvenile hall, on juvenile

probation, and at the CYA. Morelos further testified to assaulting a former boyfriend, Anthony Z., committing robberies and armed robberies around Sacramento, and sexually assaulting other inmates at the CYA. Although it went beyond the scope of his direct testimony, on cross-examination Morelos testified about forcibly sodomizing a man in Oregon while armed with a .38-caliber gun. He further testified that he killed two people in Oregon in preparation for the murders he planned to commit in San Jose. The court excluded the alleged Oregon murders and all evidence upon which there was no evidence presented by the actual victims of the particular offenses.

Weighing the relevant factors, the court concluded the factors in aggravation substantially outweighed the factors in mitigation. Based on the totality of the evidence, the facts presented, and the testimony of the witnesses, the court determined the appropriate penalty was death. The court also sentenced Morelos to a consecutive prison term of 15 years, consisting of five years for each of his prior serious felony enhancements and five years for the firearm enhancement. The court stayed the punishment for his prison priors pursuant to section 654.

## II. DISCUSSION

### A. Defendant's Exercise of his Sixth Amendment Right To Represent Himself at the Guilt and Penalty Phases

Morelos contends the trial court erred when it granted his motion to represent himself at his capital trial. Morelos claims the right to self-representation recognized in *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) does not apply in capital cases. He further asserts that the trial court erred by failing to revoke his pro se status at the penalty phase, and that

the trial court's failure to provide him counsel violated his Sixth and Eighth Amendment rights under the federal Constitution such that his conviction, special circumstance findings, and death sentence must be reversed.

### 1. Background

The Santa Clara Public Defender's Office was appointed to represent Morelos on October 23, 1992. The first amended complaint charged Morelos in Count 1 with first degree murder with malice aforethought and alleged Morelos personally used a firearm in the commission of the crime. It also alleged three special circumstances: murder in the course of a felony; murder in the commission of sodomy and oral copulation; and intentional murder involving the infliction of torture. Represented by counsel, Morelos entered a plea of not guilty as to all charges on November 30, 1992.

On January 16, 1993, Morelos requested a hearing under *People v. Marsden* (1970) 2 Cal.3d 118 to replace his counsel. The municipal court denied the request on February 22, 1993 after a hearing on the matter. On June 14, 1993, Morelos requested a second *Marsden* hearing. This matter was continued when the municipal court requested an evaluation of Morelos to determine whether any evidence of mental incompetence might lead to doubt pursuant to section 1368; the court appointed Dr. Robert Burr to conduct the examination. Based on Dr. Burr's recommendation and the representations of defense counsel, the municipal court declared a doubt as to Morelos's competency on August 23, 1993. The municipal court suspended proceedings, appointed Dr. David Echeandia to evaluate Morelos, and certified Morelos to superior court for a hearing and examination to determine his competency. On

September 22, 1993, the superior court found Morelos competent and remanded him back to municipal court for further hearings.

On October 4, 1993, Morelos notified the judge that he wanted to withdraw his *Marsden* motion. Defense counsel explained that she understood that Morelos wished to withdraw the *Marsden* motion, waive his right to a preliminary hearing, plead guilty, and proceed to the penalty phase. Defense counsel explained that her "conflict" with Morelos came down to her refusal to agree to Morelos entering a guilty plea. Counsel argued that section 1018, which prohibits a capital defendant from pleading guilty without the consent of counsel, precluded Morelos from proceeding in the manner he desired. The court encouraged the parties to brief the section 1018 issue and set the matter for a hearing.

Defense counsel submitted a brief arguing that under section 1018 and *People v. Chadd* (1981) 28 Cal.3d 739 (*Chadd*), a defendant is barred from pleading guilty in a capital case unless defense counsel agrees. After the court ruled that Morelos could not plead guilty because his counsel would not consent, Morelos agreed to proceed to a preliminary hearing. Morelos was represented by counsel at the preliminary hearing, which began on December 13, 1993.

On July 19, 1995, Morelos filed a petition to proceed in propria persona, relying on *Faretta*, *supra*, 422 U.S. at page 806. The trial court heard Morelos's motion the same day. At the hearing, Morelos affirmed that he wished to represent himself. He affirmed that his motion was not due to any feeling that he was being denied effective representation of counsel. And he testified that he understood he had a right to a public and

speedy trial and trial by jury. The trial court stated, "I'm sure that everybody, including your lawyer, and I don't know your family or — certainly I'd like to add my strong urging to you to utilize an attorney that has been appointed to represent you. You're not in a position where you're finding any fault with the particular attorney that you have, but for whatever value, again, it is for me to state, the particular attorney you have is one that is highly experienced, well-regarded, competent, and totally — and I'm speaking for you now, Mr. Cavagnaro, I assume you're ready, willing, and able to represent the defendant in these proceedings." The court informed Morelos that he would not receive any special consideration from the court, the judge assigned to his case would treat him the same as an individual represented by an attorney, and would hold him to the same standard of conduct and the same knowledge of the law. Morelos responded that he understood. Additionally, the court emphasized that Morelos's decision to represent himself "could not be of a more serious nature" since the charges "are as serious as they can be under the law." In his petition to proceed in propria persona, Morelos indicated his understanding that the prosecutor was seeking the death penalty, and the minimum sentence was life imprisonment without the possibility of parole. Morelos confirmed his understanding and with that knowledge still requested the court authorize him to represent himself.

The court then inquired whether the prosecution or defense counsel had any evidence that Morelos lacked the mental capacity to reach his decision freely and voluntarily. The prosecutor responded he had no information from any source that would indicate Morelos was not competent to represent himself. And defense counsel cited the examinations conducted by Drs. Echeandia and Burr assessing Morelos's competency to

stand trial. Both doctors opined that Morelos was competent, and the trial court found him competent to stand trial. Having met with Morelos on numerous occasions, defense counsel testified that he believed Morelos was competent to stand trial and to represent himself as required by *Godinez v. Moran* (1993) 509 U.S. 389.

The court then stated it had reviewed the applicable law and determined there was no legal impediment to granting Morelos pro per status. But the court stated: "I do this with extreme reluctance, and I'm urging you and I'll be happy, if you wish me to do so, to continue this matter to allow you further reflection on the issue, but it is most likely that once this decision is made it may well be irrevocable absent some showing that I'm not able to make at this time. But if you would like me to continue this matter to allow you to think further on the gravity of the act I'll be happy to do so, or do you wish me to grant this petition at this time?" Morelos responded: "Yes. I wish you to grant it right now, please." The prosecutor then asked Morelos if he understood that by representing himself he faced a "very strong likelihood of being convicted" and of facing the death penalty. Morelos responded "yes" and confirmed that he still desired to represent himself. The court then granted the motion, finding that Morelos had made a sufficient showing that he was competent to represent himself and aware of the consequences of that decision.

### 2. *Analysis*

A defendant has a federal constitutional right to the assistance of counsel during all critical stages of a criminal prosecution. (*Faretta*, *supra*, 422 U.S. at p. 807; *People v. Mickel* (2016) 2 Cal.5th 181, 205 (*Mickel*).) A defendant may

nonetheless waive that right, as long as the waiver is timely and valid. (*Mickel*, at p. 205; *People v. Bloom* (1989) 48 Cal.3d 1194, 1219–1220 (*Bloom*).) "The requirements for a valid waiver of the right to counsel are (1) a determination that the accused is competent to waive the right, i.e., he or she has the mental capacity to understand the nature and object of the proceedings against him or her; and (2) a finding that the waiver is knowing and voluntary, i.e., the accused understands the significance and consequences of the decision and makes it without coercion." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1069–1070.) We review a *Faretta* waiver de novo, examining the entire record to determine the validity of a defendant's waiver. (*Id.* at p. 1070.)

Here, Morelos does not contend his request was untimely, nor does he argue that the record demonstrates it was equivocal, likely because the record shows Morelos explicitly affirmed that he understood his constitutional rights and his request was of his own volition. The record shows that the trial court made clear to Morelos the risks of self-representation and Morelos — fully apprised of the possible dangers — requested the court grant his request immediately.

Rather, Morelos contends more broadly that the right to self-representation must be limited to noncapital cases. According to Morelos, the Eighth Amendment requires substantive and procedural safeguards for capital defendants and that assistance of counsel is one such procedural protection. Permitting a capital defendant to represent himself or herself at a capital trial, he asserts, presents too much of a risk that any resulting death penalty will be imposed in an arbitrary and capricious manner, rendering it unreliable. Morelos's theory is that the right to self-representation must yield in favor of the

14

state's interest in the integrity of a capital trial, so the trial court erred by permitting him to represent himself at his capital trial. Morelos further asserts that the trial court erred when it failed to revoke his pro se status at the penalty phase.

We have previously contemplated and rejected similar claims and we do so again here. As Morelos concedes, our case law makes clear that *Faretta* applies in capital cases. We have consistently held that the Sixth Amendment right to self-representation is not limited to defense during the guilt phase of trial, but also extends to the penalty phase of a capital trial. (*People v. Taylor* (2009) 47 Cal.4th 850, 865; *People v. Blair* (2005) 36 Cal.4th 686, 736–737 (*Blair*); *People v. Bradford* (1997) 15 Cal.4th 1229, 1364; *Bloom*, *supra*, 48 Cal.3d at pp. 1222–1224.) We decline Morelos's invitation to reconsider our case law on this point.

## B. Defendant's Waiver of Counsel in Violation of Section 686.1

For similar reasons, Morelos asserts that his death verdict must be reversed because section 686.1 requires that defendants in capital cases be represented by counsel. Although Morelos acknowledges our precedent that section 686.1 may only be applied where *Faretta* is not implicated, he nonetheless argues that we should "now give effect to section 686.1."

Section 686.1 requires defendants in capital cases "be represented by counsel during all stages of the preliminary and trial proceedings." Enacted by the Legislature in 1971, section 686.1 predates the United States Supreme Court's 1975 decision in *Faretta*. When the Legislature adopted section 686.1, it found "that persons representing themselves cause unnecessary delays in the trials of charges against them; that trials are

extended by such persons representing themselves; and that orderly trial procedures are disrupted. Self-representation places a heavy burden upon the administration of criminal justice without any advantages accruing to those persons who desire to represent themselves." (Stats. 1971, ch. 1800, § 6, p. 3898; see *People v. Johnson* (2012) 53 Cal.4th 519, 526.) But California law is subject to the United States Constitution and the Sixth Amendment right to self-representation. We have held that section 686.1 can only be given effect when it is not inconsistent with the Sixth Amendment right to self-representation established in *Faretta*. (*Mickel*, *supra*, 2 Cal.5th at p. 209; *People v. Burgener* (2016) 1 Cal.5th 461, 474; *Johnson*, at p. 526.) Morelos provides no persuasive reason to revisit our prior holdings on this issue.

## C. Denial of Defendant's Request for Advisory Counsel

Morelos claims the trial court erred in denying his request for advisory counsel. Representing himself, Morelos filed an application for "assistant counsel," and now argues that the trial court's failure to exercise its discretion to grant or deny his request was error. He asserts that a ruling to deny his request for advisory counsel would have been an abuse of discretion, so reversal is required, and his sentence must be set aside.

### 1. *Background*

After the trial court granted Morelos's *Faretta* motion on July 19, 1995, he represented himself in proceedings throughout the subsequent five months. On December 8, 1995, Morelos filed an application to appoint "assistant counsel" as a "second attorney," citing *Keenan v. Superior Court* (1982) 31 Cal.3d 424 (*Keenan*) and section 987, subdivision (d). The court scheduled

a hearing for December 20, 1995 to place the matter on the record and permit Morelos to further amplify his request. At the hearing, the court explained that it understood that Morelos's motion was seeking "what is commonly called *Keenan* counsel," which the court described as a form of "extra help" that "is not in any way to be construed as co-counsel or standby counsel." Noting that Morelos had been represented by the public defender's office, the court further explained that "since they apparently cannot claim a conflict of interest in this matter I am bound by law only to, in effect, appoint them. I don't have the ability to appoint extra — some conflicts attorney or someone else, so long as you're legally able to be represented by the public defender's office." The court then emphasized to Morelos "the problem I want to make sure you understand is that the public defender will not — I repeat not — agree to act in that capacity." Morelos responded that he wanted "to have somebody in the capacity of adviser," but "not really with the court, though. I'm asking Judge Hastings for expert witnesses and psychologists and psychiatrists and —." The court interjected and explained: "Well, you see, those applications are properly before Judge Hastings, and this, of course, came to Judge Hastings and he sent it back to me because I granted your *Faretta* motion, and he thought that it was appropriate — and I agreed with him — that I would hear this application and try to explain to you what's involved. Because *Keenan* counsel is not a synonym for expert witnesses or investigation or anything of that nature. It is solely limited — none of these are involved in your case."

The court further explained, "[t]he *Keenan* counsel that you're requesting is simply not — it isn't what you want. It isn't what you need. And probably I don't have the ability to comply with your request." Morelos then stated, "I would like to have it

17

withdrawn, then, withdraw the motion, if it's —." And the court responded: "Well, I can do that, Mr. Morelos. I — again I'm trying to plead with you, I guess, to take advantage of what I believe to be fine representation that's ready, willing, and able to aid you in this." Morelos represented himself at trial in both the guilt and penalty phases.

### 2. *Analysis*

As an initial matter, it is important to clarify that neither *Keenan* nor section 987, subdivision (d) is implicated here. While Morelos cited both in his application to appoint "assistant counsel" and the trial court referenced "*Keenan* counsel," *Keenan* is shorthand for section 987, subdivision (d)'s distinct authorization to a court to "appoint an *additional* attorney as a cocounsel upon a written request of the first attorney appointed." (Italics added; see *Keenan, supra*, 31 Cal.3d at p. 430.) Since Morelos represented himself, he could not ask for a second appointed attorney. (See *People v. Moore* (2011) 51 Cal.4th 1104, 1122 (*Moore*) ["section 987, subdivision (d) does not apply when a defendant is proceeding in propria persona"]; *ibid.* ["A defendant proceeding in propria persona simply is not 'the first attorney appointed' "].) Rather, Morelos asserts he was entitled to *advisory* counsel. Advisory counsel, by contrast, is available to assist a pro se defendant, but does not represent the defendant. (*People v. Lightsey* (2012) 54 Cal.4th 668, 692–693.)

As we explained in *People v. Crandell* (1988) 46 Cal.3d 833, 861 (*Crandell*), "California courts have discretion to appoint advisory counsel to assist an indigent defendant who elects self-representation. (*People* v. *Bigelow* [(1984)] 37 Cal.3d 731, 742.) When a defendant requests appointment of advisory counsel, a court's failure to exercise its discretion is serious error

and its denial of a request for advisory counsel in a capital case may constitute an abuse of discretion. (*Id.* at p. 743.) We held in *Bigelow* that failure to exercise discretion on a request for advisory counsel *in circumstances where a refusal to grant the request would be an abuse of discretion* requires automatic reversal of a resulting conviction because of the inherent difficulty in assessing prejudice. (*Id.* at pp. 744–746.)" If the failure to appoint counsel would not be an abuse of discretion, "the consequences of the error are properly assessed by employing the *Watson* harmless error standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)" (*Crandell*, at pp. 864–865.) Applying *Watson*, we inquire whether it is "reasonably probable that different verdicts would have been returned had defendant received the assistance of advisory counsel." (*Id.* at p. 866.)

The Attorney General asserts that Morelos withdrew his application for "assistant counsel." But before Morelos expressed his desire to withdraw the motion, the trial court stated, "probably I don't have the ability to comply with your request." We will assume, without deciding, that the trial court had the authority to appoint the public defender as advisory counsel notwithstanding the public defender's apparent representation that he would refuse such appointment. Further assuming that the trial court erroneously failed to recognize its discretion to grant Morelos's request, per se reversal is unwarranted because a refusal to grant Morelos's request would not have been an abuse of discretion, and any error was harmless under *Watson*.

A defendant seeking appointment of advisory counsel "must make a showing of need and the decision to grant or deny the request rests in the sound discretion of the trial court."

(*Crandell*, *supra*, 46 Cal.3d at p. 862.) We determine "on a case-by-case basis" whether denial of a request for advisory counsel would have been an abuse of discretion. (*Id*. at p. 863) " '[A]s long as there exists a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside . . . . [Citations.]' " (*Moore, supra,* 51 Cal.4th at p. 1120, quoting *People v. Clark* (1992) 3 Cal.4th 41, 111.)

We have previously described the factors a court may consider in exercising its discretion on a motion for advisory counsel. These encompass defendant's reasons for seeking advisory counsel, defendant's background, education, and demonstrated legal abilities, and the complexity of the issues involved. (*Crandell*, *supra*, 46 Cal.3d at p. 863.) If a defendant seeks advisory counsel to obstruct or delay proceedings, this weighs against the request.

Morelos's background, education, and demonstrated legal abilities, as well as the belated timing of his request for advisory counsel, support the conclusion that the trial court would not have abused its discretion by denying the request.

In *Bigelow*, where we concluded the trial court's failure to consider appointing advisory counsel was reversible error, the defendant was a Canadian national with no familiarity with California law. And although he had previously been in court, he was represented by counsel on all but one occasion when he pled guilty to a minor offense. (*People v. Bigelow*, *supra*, 37 Cal.3d at pp. 743–744.) In contrast, the record shows that Morelos is not a foreign national. Rather, he attended high school through the 10th grade, completed his GED, had one year of general education from a community college, took a business

course in prison, and "use[d] [the] law library daily for 1 yr 1993–1994." Morelos pled guilty to felony offenses in California in 1982 and 1988. In the current matter, Morelos represented himself for nearly five months before asking for advisory counsel; he had already prepared and submitted numerous legal filings to the trial court. And Morelos made his request for advisory counsel on December 8, 1995, just weeks before his trial was scheduled to begin. Granting his request for advisory counsel would likely have necessitated a delay in the proceedings. Considering all of these factors, we conclude it would not have been an abuse of discretion for the trial court to deny his motion. As such, the deprivation of advisory counsel was not per se prejudicial.

For similar reasons, Morelos fails to establish prejudice under *Watson*. Morelos made his request for advisory counsel to help with "expert witnesses and psychologists and psychiatrists." It appears he was referring to the mental health professionals who were previously appointed to evaluate him. Morelos ultimately chose not to call any mental health witnesses to testify, and instead submitted the written reports of Drs. Burr and Echeandia, as well as a third doctor, during the penalty phase of his trial.

During Morelos's penalty phase testimony, when the court asked him why he did not call Dr. Jay Jackman to testify, Morelos said he did not "care who testified" and only wanted to cover the "competency issue" to "make sure there [weren't] grounds" for reversal of his conviction on appeal. Morelos's testimony thus suggests that he had no intention of eliciting mitigating testimony from the mental health experts, which belies his contention that the failure to appoint advisory counsel to assist with these expert witnesses was prejudicial. On this

21

record, it is not reasonably probable that different verdicts would have been returned had Morelos received assistance in securing and preparing "expert witnesses and psychologists and psychiatrists."

## D. Section 1018 and the Eighth and Fourteenth Amendments

Morelos represented himself at trial and waived his right to a jury trial at both the guilt and penalty phases. At the guilt phase, he waived his opening statement, declined to cross-examine nine of the prosecution's witnesses, testified against himself, and waived his closing statement. At the penalty phase, Morelos again waived his opening statement. He called one prosecution witness, cross-examined two others, took the stand and gave his own testimony, and again waived his closing statement. Under these circumstances, Morelos argues he was allowed to effectively accomplish what section 1018 prohibits — to plead guilty in a capital case "without the consent of the defendant's counsel." (*Ibid.*) According to Morelos, "to say that [he] did not plead guilty because the court and parties went through the motions of a trial is to elevate form over substance in a manner that cannot be countenanced by section 1018." In Morelos's view, this alleged breach of section 1018 deprived him of his right to reliable proceedings under the Eighth and Fourteenth Amendments.

### 1. *Background*

In October 1993, when the Santa Clara County Public Defender's Office represented him, Morelos asserted his desire to waive his right to a preliminary examination. Morelos also indicated his interest in a negotiated settlement with the district attorney to dismiss one of the special circumstances and

was prepared to plead guilty to the underlying charge and the other special circumstance. His attorney refused to agree to any of these requests. Defense counsel asserted her understanding that under section 1018, a capital defendant cannot plead guilty without counsel's consent and specified that she refused to accept or agree to a guilty plea. The prosecution agreed. The trial court set the matter for a future hearing and encouraged the parties "to submit some sort of Points and Authorities for the Court's consideration" in the interim. Defense counsel submitted a memorandum of points and authorities identifying our precedent regarding section 1018 and argued that it was error for a trial court to accept a defendant's guilty plea without being represented by, and without the consent of, counsel. Along with this filing, defense counsel submitted a letter to the court written by Morelos that explained his desire to, and rationale for, pleading guilty. On October 27, 1993, the trial court, citing *Chadd*, *supra*, 28 Cal.3d 739 and section 1018, ruled that Morelos could not enter a plea of guilty without the consent of his attorney. After the trial court informed Morelos that he could waive a preliminary examination against his counsel's consent, Morelos stated that he wanted a preliminary hearing. At the subsequent preliminary hearing, Morelos waived arraignment and pled not guilty.

On July 19, 1995, the trial court granted Morelos's petition to proceed in propria persona. Morelos waived his right to a jury trial and proceeded to trial unrepresented. At the guilt phase of trial, Morelos waived his opening statement. He declined to cross-examine nine of the prosecution's witnesses and after the court advised him of his right to testify, Morelos took the stand and asked if he could be questioned by the prosecution. Morelos affirmed he wanted to testify and provided a narrative

23

description of the events culminating in Anderson's murder. Morelos detailed his sexual assault of Anderson, which he said lasted approximately 45 minutes and included Morelos forcing copulation and sodomy upon Anderson. He also recounted how he restrained Anderson, inflicted extreme pain upon him, and subsequently tortured him. Morelos testified that he took Anderson to Mount Hamilton and shot him in the head, but the shot did not kill Anderson immediately. So he shot Anderson again and left him there to die. Morelos also testified to two prior offenses that he had been convicted of in 1988: the robbery and burglary of John E., with enhancements for great bodily injury. After testifying, Morelos rested his case and waived his closing argument.

Morelos again waived his opening statement at the penalty phase. Morelos recalled John E. to testify. Morelos asked John E. to describe the incident between Morelos and Danger that occurred at John E.'s grandmother's house. John E. testified that, to his knowledge, Morelos and Danger sparred in the garage. The next day, Morelos told John E. that he had forced himself on Danger. Morelos also asked John E. if he recalled Morelos ever selling drugs at the Arena Hotel. John E. did.

Morelos also cross-examined the prosecution's witness Timothy F. On direct examination, Timothy F. testified that Morelos offered to orally copulate him and, when he refused, Morelos threatened him with a knife and told him that he had "raped guys before" and would do it again. On cross-examination, Morelos asked if Timothy F. believed that Morelos would have stabbed him had Morelos's mother not been home. Timothy F. said he believed Morelos would have. Morelos asked Timothy F. if he believed that Morelos would have shot him had

they been alone. Timothy F. said he did. And Morelos asked if Timothy F. believed that Morelos would have "raped" him. Timothy F. said "yes."

Morelos briefly cross-examined Kenneth M., who had testified that Morelos nearly hit him while driving a getaway vehicle for a woman who had shoplifted from the store where Kenneth M. worked as security. Morelos made an offer of proof that the incident in which he nearly hit Kenneth M. with his car went to a preliminary hearing, but there "was no holding at the preliminary hearing" and Morelos was discharged. Kenneth M. testified that he did not recall the preliminary hearing in that matter.

Morelos then testified. He provided, in narrative form, a social history of his life. He also testified to his past crimes, which included numerous sexual assaults he committed at the CYA, additional sexual assaults, and two murders in Oregon. He answered affirmatively when asked if he "enjoy[ed] raping people."

Morelos stated that he had "no thought about" killing Anderson, but he was "sorry that [he] didn't kill [James C.] and Harold [T.]." He said, "I don't have any remorse or [*sic*] over any of my actions, no." When the prosecutor asked Morelos why Judge Creed should give him the death penalty, Morelos explained, "Well, if I don't get the death penalty, I'll be going to another court because it's a matter of time I'll have a cellie and I'll eventually kill somebody else and then I will receive the death penalty. Killing somebody in custody, I believe it's death penalty, almost certain." He felt the death penalty was appropriate since he killed and had the capacity to keep killing and "the state has a right to retribution."

Morelos testified that he wanted to plead guilty, but his public defender refused to consent and also refused his request to waive a jury trial. He testified: "I know what I'm doing. I made a rational decision and I wanted to commit a bunch of murders, and that's what I did. Regardless of the psychology of it, and I think is bullshit because I could get ten different psychologists and psychiatrists and they will all come up with different reasons." He further testified: "That's the way I am and that's the way I'll always be. I'll always rape all the people and I will continue to kill people. That's the way I am." When asked if he wanted to add anything else, Morelos said, "I don't believe so." The court asked if Morelos had any witnesses to call or any evidence to present and he declined. Morelos did not make a closing argument but requested immediate transfer after a speedy sentence.

Before announcing the penalty, the court described this as "an unusual case because the defendant has wished to plead guilty since the proceedings began and has wanted to admit the special circumstances. Defendant stated he believes the appropriate penalty for his crimes is death. We have gone through a court trial which the court would characterize as a slow plea." Although the court was "troubled by the procedure" it specified that it sought guidance from *Bloom*, *supra*, 48 Cal.3d 1194. The court explained that "Morelos has offered no defense to the charges. He has offered no mitigation in the penalty phase of the trial. In fact, the defendant has exercised his constitutional right to testify and has taken the stand and under oath admitted his crimes, admitted the enhancement, the special circumstances, and he has given testimony to justify the finding for the court to impose the death penalty."

Morelos argues that his self-representation and his tactics at trial were tantamount to a guilty plea or a slow plea in violation of section 1018's consent-of-counsel requirement. He seeks reversal of his conviction and death sentence, arguing that the proceedings below contravened section 1018 and were so unreliable as to violate the Eighth Amendment.

### 2. *Analysis*

Pursuant to section 1018, "[n]o plea of guilty of a felony for which the maximum punishment is death, or life imprisonment without the possibility of parole, shall be received from a defendant who does not appear with counsel, nor shall that plea be received without the consent of the defendant's counsel." We have recognized that the state has a strong interest in reducing the risk of mistaken judgments in capital cases, and section 1018's requirement of consent of counsel is an effort to eliminate arbitrariness in the imposition of the death penalty. (*People v. Daniels* (2017) 3 Cal.5th 961, 967, 982 (conc. & dis. opn. of Cuéllar, J.) (*Daniels*) [expressing the opinion of the entire court[2]]); *People v. Alfaro* (2007) 41 Cal.4th 1277, 1300 (*Alfaro*); *Chadd, supra,* 28 Cal.3d at p. 750.) We have found reversible error where trial courts have failed to follow section 1018, permitting defendants to plead guilty to capital charges against the advice of their attorneys. (*Chadd*, at pp. 754–755; *People v. Massie* (1985) 40 Cal.3d 620, 622.)

Morelos contends that his collective actions as a self-represented defendant — repeatedly demonstrating his wish to

---

[2] See *Daniels, supra,* 3 Cal.5th at page 967 (Justice Cuéllar's "lead opinion . . . expresses the opinion of the entire court on all issues [in *Daniels*] except part II.D.," on pages 986 through 1005).

plead guilty, assisting the prosecution in making its case, and building a case against himself — were, in effect, equivalent to a "slow plea" or a guilty plea without the consent of counsel. Thus, Morelos argues, just as it was error for the trial courts to accept guilty pleas from the capital defendants in *Chadd* and *Massie* without counsel's consent, it was similarly error under section 1018 for the trial court here to condone his actions.

However, the cases Morelos relies on, finding reversible error under section 1018 when trial courts have accepted pleas from capital defendants against counsel's advice, are inapposite. The proceedings below were not tantamount to a guilty plea and therefore did not implicate section 1018 nor its attendant, constitutionally protected interest in reliable capital proceedings.

We have defined a slow plea as an " ' "agreed-upon disposition . . . which does not require the defendant to admit guilt but results in a finding of guilt . . . usually, for a promised punishment." ' " (*Daniels, supra,* 3 Cal.5th at p. 983 (conc. & dis. opn. of Cuéllar, J.) [expressing the opinion of the entire court].) A recognizable example of a slow plea "is a bargained-for submission on the transcript of a preliminary hearing in which the only evidence is the victim's credible testimony, and the defendant does not testify and counsel presents no evidence or argument on defendant's behalf." (*People v. Wright* (1987) 43 Cal.3d 487, 496 (*Wright*).) This type of submission is tantamount to a guilty plea because the defendant's guilt is apparent on the evidence presented at the preliminary hearing and conviction is a foregone conclusion as no defense is mounted. (*Ibid.*) A submission occurs when the defendant gives up his or her right to a jury trial, the right to present additional evidence as part of a defense and agrees the court can decide the case on

the basis of the transcript of prior proceedings. (*People v. Robertson* (1989) 48 Cal.3d 18, 39–40.) And a submission is defined by the fundamental protections and rights a defendant surrenders, such as the right to a jury, the right to confront witnesses, and the privilege against self-incrimination. (*Daniels*, at pp. 983–984 (conc. & dis. opn. of Cuéllar, J.); *Robertson*, at p. 40; *Chadd*, *supra*, 28 Cal.3d at p. 748.)

The trial court's passing characterization of the proceedings below "as a slow plea" misdescribes their true nature. As we explained in *Daniels¸* "a trial, even one where a defense is voluntarily forgone, is fundamentally different from a guilty plea." (*Daniels*, *supra*, 3 Cal.5th at p. 983 (conc. & dis. opn. of Cuéllar, J.) [expressing the opinion of the entire court].) At trial, the state is put to its burden of proof as to the charges, whereas a plea " 'serves as a stipulation that the People need introduce no proof whatever to support the accusation' and ' "is itself a conviction." ' (*Chadd*, *supra*, 28 Cal.3d at p. 748.)" (*Ibid*.) While Morelos waived his right to a jury trial in favor of a court trial, there is no indication that his waiver was the result of a negotiated agreement about the punishment or the evidence the prosecution would present; the prosecution was held to its burden of proof at the guilt and penalty phases. (See *id.* at p. 984 (conc. & dis. opn. of Cuéllar, J.).) The record shows that Morelos affirmed that no one promised him anything or used any force, threats, or pressure to induce his decision to waive his right to a jury trial.

Nor does the record suggest Morelos gave up the opportunity to exercise his right to confront witnesses or challenge the evidence at trial. Although Morelos declined to cross-examine nine of the prosecution's witnesses, he did not waive his right of confrontation. Morelos reserved the right to

call a witness who had testified against him and cross-examined three prosecution witnesses. Although he now argues he did so only to elicit aggravating evidence, his questioning of these witnesses demonstrates that he exercised, rather than relinquished, his right of confrontation. Morelos's decision not to cross-examine all of the prosecution's witnesses was not an express waiver of his right to confront and cross-examine witnesses required as part of a submission. (*Wright, supra*, 43 Cal.3d at p. 497.)

Morelos did not preserve the privilege against self-incrimination and instead chose to testify at both the guilt and penalty phases. At the guilt phase, Morelos asked the court if he could take the stand and be questioned by the prosecution. At the penalty phase, the personal narrative and social history he provided in his testimony included details of childhood abuse and family struggles that could be assessed as mitigating factors. And while section 1018 advances the purpose of ensuring reliable judgments in capital cases, the concern for reliability does not require or justify forcing a defendant to present an affirmative defense in a capital case. (*Bloom, supra*, 48 Cal.3d at p. 1228.) Requiring a defendant to present a defense or prohibiting a defendant from testifying would contravene the autonomy and dignity interests underlying the Sixth Amendment right to self-representation. (*Mickel, supra*, 2 Cal.5th at pp. 181, 210; *Blair, supra*, 36 Cal.4th at pp. 686, 738.) And as we have acknowledged, requiring a pro se defendant to present a vigorous defense "would produce perverse incentives, encouraging defendants who wish to avoid the death penalty to decline to present any defense, knowing that their sentence will be reversed on appeal." (*Daniels, supra*, 3 Cal.5th at p. 985 (conc. & dis. opn. of Cuéllar, J.) [expressing

the opinion of the entire court]; see also *Bloom*, at pp. 1227–1228.)  In sum, Morelos's actions at trial did not amount to an unreliable slow plea in violation of section 1018.

## E.  Section 1018 and the Sixth Amendment

Morelos alternatively argues that section 1018's consent-of-counsel requirement violates a defendant's Sixth Amendment right to control the prerogative of his or her defense, a right recently underscored by the United States Supreme Court in *McCoy v. Louisiana* (2018) 584 U.S. __ [138 S.Ct. 1500] (*McCoy*). Morelos recognizes that this argument and his claim, *ante*, that his trial court proceedings violated section 1018 are mutually exclusive since they require us to either enforce section 1018 or invalidate it, but he nevertheless asks us to accept either argument.

As explained, on October 27, 1993, the trial court precluded Morelos from pleading guilty after "review[ing] Penal Code section 1018, as well as the cases that relate to that code section, specifically *People versus Chadd*, 28 Cal.3d. 739."

In *Chadd*, we read *Faretta*'s conclusion that self-representation is "an independent right implied by the structure . . . of the Sixth Amendment" as not affecting the Legislature's "authority to condition guilty pleas in capital cases on the consent of defense counsel." (*Chadd*, *supra*, 28 Cal.3d at pp. 751, 750.) We observed that *Faretta* addressed a defendant's "right to 'make a defense' in 'an adversary criminal trial,' " and concluded, "[n]othing in *Faretta,* either expressly or impliedly, deprives the state of the right to conclude that the danger of erroneously imposing a death sentence outweighs the minor infringement of the right of self-representation resulting when

defendant's right to plead guilty in capital cases is subjected to the requirement of his counsel's consent." (*Id.* at p. 751.)

Over 25 years after we decided *Chadd*, we again held section 1018 constitutional in *Alfaro, supra,* 41 Cal.4th 1277. There, "the defendant accepted complete responsibility for the offenses in a videotaped confession on the day of her arrest." (*People v. Frederickson* (2020) 8 Cal.5th 963, 992 (*Frederickson*), citing *Alfaro*, at p. 1295.) Ten days before jury selection began, defense counsel informed the trial court that the defendant wanted to plead guilty " 'against [his] vigorous, vigorous advice.' " (*Alfaro*, at p. 1296) The court explained that under section 1018 the defendant could not plead guilty against her attorney's advice. (*Ibid.*) The prosecutor "argued during the penalty phase that the defendant had not accepted responsibility and lacked remorse, and the jury did not hear evidence [reflecting] that [she] had attempted to enter a guilty plea." (*Frederickson*, at p. 992, citing *Alfaro*, at pp. 1296–1297.)

Our *Alfaro* decision acknowledged the defendant's argument that "a defendant has the ultimate, fundamental right to control his or her own defense," but concluded that section 1018 was "one of several exceptions to the general rule recognizing ' "the need to respect the defendant's personal choice on the most 'fundamental' decisions in a criminal case." ' " (*Alfaro, supra*, 41 Cal.4th at p. 1298.) We noted that "[t]he statute constitutes [a] legislative recognition of the severe consequences of a guilty plea in a capital case, and provides protection against an ill-advised guilty plea and the erroneous imposition of a death sentence." (*Id.* at p. 1300.)

After these decisions by our court, in *McCoy*, *supra*, 584 U.S. at p. __ [138 S.Ct. at p. 1500], the United States

Supreme Court considered whether the Sixth Amendment precluded defense counsel from admitting the defendant's guilt before a jury over the defendant's objection. There, "the defendant vociferously insisted that he did not engage in the charged [murders] and adamantly objected to any admission of guilt," but his attorney thought the best strategy was to admit the crimes during the guilt phase and seek mercy during the penalty phase. (*McCoy*, *supra*, 584 U.S. at p. __ [138 S.Ct. at p. 1505].) The trial court denied the defendant's request to remove his counsel and defense counsel's request to be relieved if the defendant secured another attorney. (*Id.* at p. __ [138 S.Ct. at p. 1506]) The court told counsel to decide how to proceed. (*Ibid.*) Defense counsel acknowledged during his opening statement that the evidence unambiguously showed the defendant committed the three murders, while the defendant thereafter testified he was innocent. (*Id.* at p. __ [138 S.Ct. at p. 1507].) The jury found the defendant guilty and returned three death verdicts. (*Ibid.*)

"The [*McCoy*] defendant, represented by new counsel, unsuccessfully moved for a new trial on the ground that the court had violated his constitutional rights by allowing counsel to concede his guilt over his objection." (*Frederickson*, *supra*, 8 Cal.5th at p. 993, citing *McCoy*, *supra*, 584 U.S. at p. __ [138 S.Ct. at p. 1507].) The Louisiana Supreme Court affirmed the trial court's ruling, concluding that defense counsel had authority to make such a concession against the defendant's wishes "because defense counsel reasonably believed that admitting guilt offered the defendant the best chance to avoid a death sentence." (*Frederickson*, at p. 993, citing *McCoy*, at p. __ [138 S.Ct. at p. 1507].)

The United States Supreme Court reversed the judgment. (*McCoy, supra,* 584 U.S. at p. __ [138 S.Ct. at p. 1512].) It explained that "[t]he trial court's allowance of [defense counsel's] admission of McCoy's guilt despite McCoy's insistent objections was incompatible with the Sixth Amendment." (*Id.* at p. __ [138 S.Ct. at p. 1512].) "While some decisions, such as trial management, are best left to counsel, '[s]ome decisions . . . are reserved for the client — notably, *whether to plead guilty*, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal.'" (*Frederickson, supra,* 8 Cal.5th at p. 993, quoting *McCoy,* at p. __ [138 S.Ct. at p. 1508], italics added by *McCoy.*) Counsel can make "strategic choices about how best to *achieve* a client's objectives," but the defendant chooses the objectives, such as an objective to "maintain innocence of the charged criminal acts." (*McCoy,* at pp. __ [138 S.Ct. at pp. 1508, 1509])

Most recently, in *Frederickson, supra,* 8 Cal.5th 963, the capital defendant, like Morelos, raised a constitutional challenge to section 1018. We directed the parties to file supplemental briefs addressing the relevance, if any, of *McCoy* on the issue. Ultimately, our *Frederickson* opinion detailed the decision in *McCoy,* but we had no need to decide its bearing on the defendant's claim because the defendant forfeited his constitutional challenge to section 1018 by failing to adequately present it to the superior court. (*Frederickson,* at pp. 993–994.) In 1996, when the *Frederickson* defendant attempted to plead guilty in the municipal court, "the judicial officers before whom he appeared were not acting as judges; rather, they were sitting as magistrates" and they lacked statutory authority to accept guilty pleas in a capital case. (*Id.* at p. 995.) As we explained, "[i]f defendant wanted to challenge the constitutionality of

section 1018, whether on the ground that it precluded him from using a guilty plea to lay the foundation for a penalty phase remorse argument or on some other ground, he needed to request to plead guilty in the superior court and ask that court to make a ruling based on section 1018, thus preserving the issue on appeal. He never did so." (*Id.* at p. 994.) Moreover, "[a]t no point did the municipal court rule that, based on section 1018, it would not accept defendant's guilty plea." (*Id.* at p. 996.)

Like in *Frederickson*, at the time Morelos sought to plead guilty, the municipal court was not authorized to receive a guilty plea in a capital case and Morelos never requested to plead guilty in superior court. However, unlike in *Frederickson*, there is no doubt that defendant secured a ruling from the municipal court that he could not plead guilty under section 1018. After encouraging briefing from the parties on the question, the municipal court concluded that section 1018 and our decision in *Chadd* prevented it from taking a guilty plea from Morelos absent his counsel's consent. By contrast, the *Frederickson* defendant's requests to plead guilty in municipal court were denied on bases unrelated to section 1018. (*Frederickson*, *supra*, 8 Cal.5th at p. 996.) Here, since the municipal court itself appears to have overlooked its own jurisdictional limitations in making its ruling, which was expressly premised on section 1018, we will assume arguendo that Morelos preserved his claim. Under these circumstances, we will address the merits of Morelos's constitutional challenge to section 1018.

Proceeding to the merits, we decline to read into *McCoy*'s passing dictum a credible basis for overruling our longstanding precedent upholding the constitutionality of section 1018. Like the defendants in *Chadd* and *Alfaro*, Morelos makes no claim that he sought to plead guilty in hopes of a more favorable

outcome during the penalty phase. (See *Chadd*, *supra*, 28 Cal.3d at p. 753 [the defendant wanted "the state to help him commit suicide"]; *Alfaro*, *supra*, 41 Cal.4th at p. 1300 ["defendant desired to plead guilty in order to avoid testifying against" someone she and her family had reason to fear].) Accordingly, as in those cases, we have no occasion to consider here whether a defense strategy to plead guilty in hopes of a more favorable outcome during the penalty phase should override the protective provisions of the statute. (*Alfaro*, at pp. 1299–1300.)

Moreover, *McCoy* is the factual inverse of this case. *McCoy* was a jury trial case in which defense counsel overrode the defendant's express objective to maintain his innocence. It did not consider a defendant's wish to admit guilt, let alone whether states can preclude a capital defendant from pleading guilty without counsel's consent in order to advance the state's strong interest in reliable capital convictions. As we have previously discussed, a guilty plea has unique consequences. (See *ante*, at pp. 28–29.) "Indeed, it serves as a stipulation that the People need introduce no proof whatever to support the accusation: the plea ipso facto supplies both evidence and verdict." (*Chadd*, *supra*, 28 Cal.3d at p. 748.) While *McCoy*'s dictum that "[s]ome decisions . . . are reserved for the client — notably, whether to *plead guilty*" (*McCoy*, *supra*, __ U.S. at p. __ [138 S.Ct. at p. 1508], italics added) certainly reiterates the critical importance of a defendant's autonomy interests, absent a clearer directive, we are not convinced it renders section 1018 unconstitutional. Indeed, long before *McCoy* was decided, the high court said essentially the same thing in *Jones v. Barnes* (1983) 463 U.S. 745, 751, and we nevertheless upheld section 1018 in *Alfaro*. (See *Jones v. Barnes*, at p. 751 ["It is also

recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to *whether to plead guilty*, waive a jury, testify in his or her own behalf, or take an appeal" (italics added)].)  *McCoy*'s dictum does not change the legal landscape that was before us when we decided *Chadd* and *Alfaro*.

In sum, in view of the high stakes consequences for a defendant in a capital case, we are unpersuaded that *McCoy*'s passing dictum precludes the state from concluding "that the danger of erroneously imposing a death sentence outweighs the minor infringement of the right of self-representation resulting when defendant's right to plead guilty in capital cases is subjected to the requirement of his counsel's consent." (*Chadd*, *supra*, 28 Cal.3d at p. 751.)

## F.  Defendant's Waiver of His Constitutional Right to a Jury Trial

Morelos contends the record fails to establish a valid waiver of his right to a jury trial at the guilt, special circumstance, and penalty phases of his trial, requiring reversal.

### 1.  Background

On July 27, 1995, the prosecutor told Judge Ball that he had spoken with Morelos and that they "would be likely to waive jury on this case both as to the penalty and guilt phase." Morelos confirmed, "Yes, that's correct."  Judge Ball responded that while he was "prepared to take a jury waiver on the guilt phase issues," he was "not convinced that it's either in the interest of justice to take a jury waiver on the penalty phase" and that if the parties agreed, he would "be willing to take a waiver of a jury as to the guilt phase and merely select a jury for purposes of penalty."  The prosecutor explained that he

preferred to have a court trial all the way through to avoid the necessity of going through voir dire on a jury with a self-represented defendant. Judge Ball stated that he had "considered the matter long and hard" and researched the issue. He again stated that he determined "the interest of justice can best be served by a waiver of a jury as to the guilt phase and a selection of a jury for purposes of the penalty phase."

At the subsequent hearing on August 2, 1995, Judge Ball inquired if the parties had considered his previously stated position that he would accept a jury waiver as to the guilt phase, but not the penalty phase. The prosecutor responded that "it is still Mr. Morelos' [*sic*] wish and my wish to have a judge sitting without jury decide the penalty of this case." He continued, "I know you've indicated the way you feel Mr. Morelos and I feel that we would like to have a judge decide this" and inquired as to the possibility of having the case assigned to another judge. Judge Ball stated that the parties "may have to inquire as to other judges whether or not they are willing to accept a jury waiver on the penalty phase" and that he had no hesitation in referring the matter to another judge to inquire "if there is any judge that is willing to accept the jury waiver on the penalty phase." If no judge was willing to take a penalty phase waiver, the prosecutor indicated that Judge Ball's department would be his first choice; Morelos agreed.

At the August 9, 1995 hearing, Judge Ball stated that he discussed the jury waiver matter with the presiding judge of his division and was advised that Judge Creed was amenable to a waiver of trial by jury as to both guilt and penalty and the case would be assigned to him. On August 11, 1995, Morelos agreed to waive time until Judge Creed was available to try his case. Judge Ball then explained that the supervising judge suggested

that he could take a specific jury waiver for Judge Creed and then assign the matter directly to him. The parties agreed and Judge Ball took Morelos's jury waiver. Morelos was self-represented.

> "THE COURT: Now, you understand that you have an absolute constitutional right to trial by a jury. In other words, 12 individuals to make the factual determination both as to your guilt and in the event that that jury would find you guilty and determine one or more special circumstances to be true, that you would have a constitutional right to a jury to determine the penalty for which the crimes would be punishable.

> Now, that's been explained to you and you understand that, correct.

> "THE DEFENDANT: Yes. That's been explained and I do understand it.

> "THE COURT: And you — at this time, it's my understanding based upon that understanding, you wish to freely and voluntarily waive those rights to those jury trials, provided that Judge Daniel Creed will make this specific to this particular judge, is agreeable to hear your trial; is that correct?

> "THE DEFENDANT: Yes, I waive jury.

> "THE COURT: Now, has anybody promised you anything, used any force, threats, pressure on you of any kind to get you to make that decision?

> "THE DEFENDANT: No, no one.

> "THE COURT: In other words, you've made that decision freely and voluntarily based on your own knowledge and

understanding of the facts, and that the law that has been explained to you and that you understand?

"THE DEFENDANT:  Yes.

"THE COURT:  All right.  The People wish to join in that jury waiver, Mr. Schon?

"MR. SCHON:  Yes, your Honor.

"THE COURT:  All right.  Based upon the fact that the defendant has so indicated, the Court will find that the defendant freely, knowingly and intelligently has, in fact, waived his right to a jury trial both as to the penalty and the guilt phase of the Information.  And that waiver is limited specifically to the availability of Judge Daniel Creed hearing the matter."

Having so found, Judge Ball assigned the matter to Judge Creed.

At the start of trial on January 3, 1996, Judge Creed asked Morelos several questions regarding his decision to waive a jury trial.

"THE COURT:  At this time you want to go forward representing yourself?

"THE DEFENDANT:  Yes.

"THE COURT:  You also do understand that you have an absolute constitutional right to have a trial by jury?

"THE DEFENDANT:  Yes.

"THE COURT:  And you understand that right?

"THE DEFENDANT:  Yes, sir.

"THE COURT:  And do you give up that right at this time?

"THE DEFENDANT:  Yes, your Honor, I do."

At the beginning of the penalty phase, Judge Creed again asked Morelos about his desire to waive his right to a jury trial.

"THE COURT:  Mr. Morelos, we have ended phase one, which is the guilt phase of the trial.  We're about to begin phase two, which is the penalty phase.  Let me clarify something.  At this particular time if you so desire we could break the trial if you decided, one, you wanted to be represented by an attorney, or two, if you decided you wanted to go to the second phase with the jury, you could make that request at this time and I would grant that request.  Is that what you want to do?

"THE DEFENDANT:  No, sir, I do not.

"THE COURT:  You want to continue on as a court trial?

"THE DEFENDANT:  Yes, I do."

### 2. Analysis

A criminal defendant has the constitutional right to a jury trial.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16; *People v. Sivongxxay* (2017) 3 Cal.5th 151, 166 (*Sivongxxay*).)  However, a defendant may waive this fundamental right to a jury trial by a personal and express waiver in open court and by consent of both parties.  (Cal. Const., art. I, § 16; *People v. Collins* (2001) 26 Cal.4th 297, 308 (*Collins*); *People v. Hovarter* (2008) 44 Cal.4th 983, 1026.)  To be valid, the record must show the defendant's waivers of the right to a jury are knowing, intelligent, and voluntary.  (*Collins*, at p. 305.)  In making such a determination, we examine "the totality of the circumstances" unique to each case.  (*Sivongxxay*, at p. 167.)

Morelos acknowledges that he agreed, during the waiver colloquy, that his right to a jury trial at the guilt and penalty

phases had been explained to him and that he understood that right. However, he contends Judge Ball inadequately explained the contours of the jury trial right; specifically, the judge's "statement may have illuminated the size of a jury (12 individuals), but it did not elaborate on what a jury trial entails, how a jury is selected, that jury members must be impartial and their verdict unanimous, or that a judge alone would decide his fate."

We take this opportunity to reemphasize "the value of a robust oral colloquy in evincing a knowing, intelligent, and voluntary waiver of a jury trial." (*Sivongxxay*, *supra*, 3 Cal.5th at p. 169.) In *Sivongxxay*, we recommended "that trial courts advise a defendant of the basic mechanics of a jury trial in a waiver colloquy, including but not necessarily limited to the facts that (1) a jury is made up of 12 members of the community; (2) a defendant through his or her counsel may participate in jury selection; (3) all 12 jurors must unanimously agree in order to render a verdict; and (4) if a defendant waives the right to a jury trial, a judge alone will decide his or her guilt or innocence." (*Ibid.*) Indeed, a thorough record of a jury trial waiver aids meaningful appellate review. However, our guidance in *Sivongxxay* was simply that, it was "not intended to limit trial courts to a narrow or rigid colloquy" and "[u]ltimately, a court must consider the defendant's individual circumstances and exercise judgment in deciding how best to ensure that a particular defendant who purports to waive a jury trial does so knowingly and intelligently." (*Id.* at p. 170; see *Daniels*, *supra*, 3 Cal.5th at pp. 992–993 (conc. & dis. opn. of Cuéllar, J.) ["We continue to eschew any rigid rubric for trial courts to follow in order to decide whether to accept a defendant's relinquishment of this right"]; *id.* at p. 1018 (conc. & dis. opinion of Corrigan, J.)

["We have consistently eschewed any rigid formula or particular form of words that a trial court must use to ensure that a jury trial waiver is knowing and intelligent"].)

Here, the relevant circumstances demonstrate that Morelos's waiver was voluntary, knowing, and intelligent. Looking first at the colloquy itself, Judge Ball advised Morelos that he had "an absolute constitutional right to a trial by a jury." Morelos was also told that a jury trial means "12 individuals to make the factual determination . . . as to your guilt." He was further informed that should the jury "find you guilty and determine one or more special circumstances to be true," he "ha[s] a constitutional right to a jury to determine the penalty." Four separate times, the trial court asked Morelos if he understood the right he was giving up. As quoted in full above, Morelos was first asked: "Now, that's been explained to you and you understand that, correct[?]" He replied, "Yes. That's been explained and I do understand it." Judge Ball then asked Morelos if he wished to waive his jury trial rights and have a specific judge, Judge Creed, hear his trial. Morelos said, "Yes, I waive jury." Morelos was then asked to confirm that he "freely and voluntarily" waived his right to a jury trial. Morelos was thereafter asked to confirm that no one "promised you anything, used any force, threats, pressure on you of any kind to get you to make that decision." He then was asked to confirm that "you've made that decision freely and voluntarily based on your own knowledge and understanding of the facts, and that the law that has been explained to you." Morelos answered in the affirmative each time. Thereafter, Judge Creed first, prior to the commencement of the guilt phase, confirmed with Morelos that he understood he had "an absolute constitutional right to have a trial by jury," and then asked Morelos to separately

confirm that he understood the right and wished to give up the right, which he did. Then prior to the commencement of the penalty phase, Judge Creed informed Morelos that he could now "break the trial" to enable Morelos to choose to have counsel represent him and/or have a jury empaneled for the penalty phase, and Morelos again declined. At no point in these colloquies did Morelos indicate confusion or ask any questions.

Thus, the trial court's colloquies were not in any way "devoid of meaningful advisement" or "threadbare." (Dis. opn. of Liu, J., *post*, at pp. 2, 9.) Morelos waived a jury three different times before two different judges, and was expressly told that he had a constitutional right to a jury, that the jury would be comprised of 12 individuals, that the jury would make a factual determination as to his guilt, and that he had a separate constitutional right to a jury at his penalty trial. The court then asked Morelos repeatedly if he was making his decision freely and voluntarily and he confirmed each time that he was. In short, Morelos was substantively advised about the core nature of a jury trial and the consequences of waiving such a trial: that his entire case — including any penalty phase — would be tried before a judge, specifically Judge Creed.[3]

---

[3] Though our dissenting colleague concedes "that we have not insisted on a rigid rubric of advisements, nor have we required advisement of every one of the[] four [jury trial attributes cited in *Sivongxxay*, *supra*, 3 Cal.5th at page 169] in order to uphold a jury trial waiver" (dis. opn. of Liu. J., *post*, at p. 2), he repeatedly focuses on three purported omissions from the jury waiver colloquies: that Morelos was not told "he could participate in jury selection, that the jury must be unanimous in order to render a verdict, or that a judge alone would decide his guilt and the appropriate penalty in the absence of a jury."

Moreover, while Judge Ball did not explicitly reference Morelos's right to participate in jury selection during the colloquy, Judge Ball otherwise made mention of jury selection prior to the waiver hearing, and spoke about how jury selection might affect the timing of trial should the parties fail to secure a judge willing to take a penalty phase jury waiver. For instance, at the August 2, 1995 hearing, Judge Ball stated, "I haven't discussed with you both scheduling and just when you perceive this matter would be ready for trial, and at what time, what stage juries would be impanelled [*sic*] and the attendant issues in terms of jury selection." At a different hearing, the prosecutor, in the presence of Morelos, stated that a court trial was preferred to "avoid the necessity of going through voir dire on a jury with a pro per." The dissent notes that this discussion "provide[s] no meaningful information about how a jury is selected or Morelos's right to participate in that process." (Dis. opn. of Liu, J., *post*, at p. 12.) But the fact remains that multiple references in two separate hearings to jury selection (including

_____

(Dis. opn. of Liu, J., *post*, at p. 5; see also *id.* at pp. 2, 10.) We have never suggested that the failure to advise on these three points renders a jury waiver unknowing and unintelligent. To the contrary, we have emphasized that we must examine "the totality of the circumstances." (*Sivongxxay, supra*, 3 Cal.5th at p. 167; see *Daniels, supra*, 3 Cal.5th at p. 991 (conc. & dis. opn. of Cuéllar, J.).) And we have rejected claims that jury trial waivers were invalid because of a trial court's failure to explicitly mention many of the same jury trial attributes that the dissent now relies on here. (See *Sivongxxay*, at p. 168 ["under the totality of the circumstances standard," the failure to mention juror unanimity and impartiality did not render the "defendant's waiver constitutionally infirm"]; *Weaver, supra*, 53 Cal.4th at pp. 1072–1074 [the failure to advise the defendant of his right to participate in jury selection did not render his jury trial waiver invalid].)

reference to timing concerns related to jury selection and to concerns about conducting jury selection with a self-represented defendant) are relevant to our assessment of the "totality of circumstances" of Morelos's understanding of his right to a jury. (*Sivongxxay, supra,* 3 Cal.5th at p. 167.)

Consistent with the conclusion that Morelos knowingly waived his right to a jury trial, Morelos's pretrial conduct and actions at trial made clear his desire to have his guilt and penalty adjudicated expeditiously. More than two years prior to the commencement of trial, Morelos repeatedly expressed a desire to plead guilty. On October 4, 1993, Morelos's attorney pointedly told the court that defendant wanted "to enter a plea of guilty to the charges, and to proceed to the penalty phase." A few weeks later, in a letter to the court, Morelos explained that he "was looking for a way to plead guilty." After he could not plead guilty, Morelos moved to represent himself. During the hearing on his *Faretta* motion, Morelos testified that he understood he had a right to a trial by jury; he initialed his *Faretta* form to indicate his understanding of the same. During his penalty phase testimony, Morelos told the court, "I tried to have a speedy trial. [. . .] [¶] I wish to plead guilty." As explained *ante*, during Morelos's penalty phase testimony, when the court asked him why he did not call a psychiatrist to testify, Morelos said he did not "care who testified" and only wanted to cover the "competency issue" to "make sure there [weren't] grounds" for reversal of his conviction on appeal. It is apparent from this record that Morelos's choice to waive his jury trial right was part of a deliberate, overall strategy spanning years to quickly obtain reliable, appeal-proof verdicts.

In arguing that Morelos's waiver was invalid, Morelos and the dissent emphasize the fact that Morelos was self-

represented at the time of his waiver. It is correct that the absence of counsel may be "a relevant factor" in determining whether a defendant knowingly and intelligently waives his right to a jury trial. (Dis. opn. of Liu, J., *post*, at p. 6.) "Nonetheless, it is well established that a self-represented defendant may validly waive a jury trial without the guiding hand of counsel." (*Daniels*, *supra*, 3 Cal.5th at p. 1024 (conc. & dis. opn. of Corrigan, J.).) On the record here, the absence of counsel did not render Morelos's waiver unknowing and unintelligent.

It is true that at the moment Morelos waived his right to a jury, he was without counsel. But, it is relevant that, as noted *ante*, Morelos exhibited some legal knowledge, submitting filings with citations to relevant authority on numerous issues. More significantly, Morelos was represented by counsel in his case for over two and a half years before he moved to represent himself; he was represented up until less than a month before he entered his jury waiver. Indeed, defendant confirmed during his penalty phase testimony that he had discussed waiving a jury with his attorneys. He testified that he "asked to waive jury trial" and "[t]hey" — meaning his attorneys — "refused that." While we need not rely on this testimony in light of the strength of the record otherwise, as it was not before the trial court at the time it accepted Morelos's jury trial waiver, it does offer unique insight into Morelos's thought processes and supports the conclusion that his waiver was voluntary, knowing, and intelligent.

Furthermore, prior to Morelos's jury trial waiver, the prosecutor explained to the court that he and Morelos had multiple conversations concerning Morelos's desire to waive a jury. In fact, at the July 27, 1995 hearing, Morelos said it was

"correct" that he "would be likely to waive jury on this case both as to the penalty and guilt phase." That hearing concluded with the prosecutor indicating that he and Morelos should discuss Judge Ball's proposal to only accept a waiver for the guilt phase. At the August 2, 1995 hearing, the prosecutor, in the presence of Morelos, explicitly referenced "Mr. Morelos' [*sic*] wish . . . to have a judge sitting without jury decide the penalty of this case" and acknowledged "I know you've indicated the way you feel Mr. Morelos." Though the dissent accuses the majority of drawing "speculative inferences" (dis. opn. of Liu, J., *post*, at p. 14), it is the dissent who speculates here, suggesting that the prosecutor somehow pressured Morelos into waiving a jury. While the dissent asserts that this is not the intended suggestion (*id.* at p. 9), it nonetheless goes to great lengths to emphasize that the prosecutor "drove," "pursued," was "insistent in," was "intent on," "pushed," and was "determined" to have a court trial. (*Id.* at pp. 7, 8, 9.) We can only assume these word choices were intentional. But there is nothing in the record to reflect that the prosecution "drove" or "pushed" Morelos to waive a jury. And again, the dissent ignores that we must look at the "totality of the circumstances" (*Sivongxxay*, *supra*, 3 Cal.5th at p. 167); the fact that Morelos willingly waived his right to a jury trial after having multiple conversations with the prosecutor about waiving a jury trial is a relevant data point in our analysis.

Finally, Morelos's jury waiver was contemplated over an extended period of time. Morelos consistently persisted in his desire to waive his penalty phase jury despite Judge Ball's resistance and the seeming inconvenience of having to find a judge who would agree to accept a waiver as to both the guilt and penalty phases of trial. He agreed to waive his speedy trial rights because doing so was necessary to ensure Judge Creed

could hear his entire trial. And at the beginning of the guilt and penalty phases, Judge Creed confirmed Morelos's desire to proceed without a jury.

The dissent "do[es] not understand how [the fact that Morelos's waiver was considered over "an extended period of time" (*ante,* at p. 48)] sheds any light on what Morelos knew about a jury trial [waiver]." (Dis. opn. of Liu, J., *post,* at p. 14.) But the timeline here proves to be an important part of "the totality of the circumstances" surrounding Morelos's waiver. (*Sivongxxay, supra,* 3 Cal.5th at p. 167.) During the time leading up to his waiver, Morelos was able to talk to the prosecutor and engage with the court. He was willing to delay the start of his trial to make sure that Judge Creed, who would accept a jury waiver at the guilt phase, could hear his case. Months later, Judge Creed confirmed with Morelos that he wished to waive his jury trial rights. Morelos did not have to make his waiver decision rashly or without time to reflect. This factor further supports our conclusion that Morelos's jury waiver was knowing and intelligent.

These circumstances stand in stark contrast to those in *Daniels*, upon which Morelos principally relies, wherein a majority of this court upheld the defendant's jury trial waiver for the guilt phase, but found the defendant's penalty phase waiver constitutionally infirm. In *Daniels*, it was the judge who introduced the idea of a jury trial waiver, and he did so on the same day the waiver was taken; "[u]p until that point, Daniels never explicitly requested or referenced a court trial." (*Daniels, supra,* 3 Cal.5th at p. 993 (conc. & dis. opn. of Cuéllar, J.).) In contrast to this rushed, judge-driven sequence of events in *Daniels*, Morelos's desire to waive jury was expressed to the trial court nearly three weeks before his waiver was accepted and

months before trial.  Morelos confirmed his desire to waive jury on three separate occasions, in front of two different judges. Unlike the *Daniels* judge who prompted the defendant's waiver, Judge Ball repeatedly expressed reluctance to accept a jury waiver at the penalty phase.  Judge Ball's ongoing concern that a jury trial waiver at the penalty phase would not serve "the interest of justice" almost certainly conveyed to Morelos the importance of the jury trial right, and the potential disadvantages of waiving it.

The waiver colloquy here was also more substantial than in *Daniels*.  The court in *Daniels* did not orally advise Daniels that a jury is comprised of 12 individuals, or ask him if he understood what the jury trial right entailed.  (*Daniels*, *supra*, 3 Cal.5th at pp. 986–988 (conc. & dis. opn. of Cuéllar, J.).)  As stated, here, Judge Ball advised Morelos that his jury would be made up of 12 individuals and that a waiver meant Judge Creed would decide his guilt and penalty.  Judge Ball also confirmed that the jury trial right had been explained to Morelos and that he understood it.  There was no comparable exchange in *Daniels*. We therefore disagree with the dissent that "the record of advisement here leaves as much doubt about the validity of the waiver as the record in *Daniels*."  (Dis. opn. of Liu, J., *post*, at p. 5.)

More generally, the dissent concludes "the record provides no indication that Morelos waived a jury trial ' " ' " with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." ' " ' "  (Dis. opn. of Liu, J., *post*, at p. 15.)  We read the record quite differently. The dissent asserts that our conclusion that Morelos was adequately advised about the substance of his jury trial right relies on "loose conjecture" and "speculative inferences."  (Dis.

opn. of Liu, J., *post*, at p. 14.)  But our holding relies on neither speculation nor conjecture.  It is based on uncontested facts.  To summarize, Morelos was:  (1) advised that he had a constitutional right to a jury, that the jury would be comprised of 12 individuals, that the jury would make a factual determination as to his guilt, and that he had a separate constitutional right to a jury at his penalty trial; (2) he ultimately waived jury three separate times before two separate judges; (3) in waiving his right to counsel, Morelos affirmed orally and in writing that he understood he had a right to a trial by jury; (4) jury selection was discussed at two separate hearings in Morelos's presence before he waived jury; (5) Morelos had multiple conversations with the prosecutor about his jury trial waiver; (6) Morelos testified at his penalty trial that he had discussed waiving jury with his lawyers, stating that he "asked to waive jury trial" and "[t]hey" — meaning his attorneys — "refused that"; (7) Morelos exhibited some legal knowledge in pretrial proceedings, including submitting filings with citations to relevant authority on numerous issues; and (8) Judge Ball told Morelos that he was concerned that a jury trial waiver at the penalty phase would not serve "the interest of justice," thereby conveying to Morelos the importance of a jury and the potential disadvantages of waiving a jury trial.  These facts are not in dispute.  Given this record, we simply disagree with the dissent that Morelos's jury trial waiver was constitutionally infirm because Morelos was not also advised that "he could participate in jury selection, that the jury must be unanimous in order to render a verdict, or that a judge alone would decide his guilt and the appropriate penalty in the absence of a jury." (*Id.* at p. 5.)  Instead, we repeat that there is not "any rigid formula or particular form of words that a trial court must use

in taking a jury waiver" (*Sivongxxay*, *supra*, 3 Cal.5th at p. 169) and "[u]ltimately, a court must consider the defendant's individual circumstances and exercise judgment in deciding how best to ensure that a particular defendant who purports to waive a jury trial does so knowingly and intelligently" (*id.* at p. 170). The totality of the circumstances here establish a sound and "affirmative[]" basis (*Collins*, *supra*, 26 Cal.4th at p. 310) to conclude that Morelos provided a knowing and intelligent waiver of his right to a jury trial at the guilt, special circumstance, and penalty phases of his trial.

## G.  Statutory Jury Trial Waiver Requirements

Morelos argues that the court committed statutory error by failing to take a separate jury trial waiver for the special circumstance allegations, as required under *People v. Memro* (1985) 38 Cal.3d 658, 700–704.

Section 190.4, subdivision (a) requires a " 'separate, personal waiver' of the right to a jury for a special circumstance allegation, above and beyond the standard guilt phase and penalty phase waiver." (*Sivongxxay, supra*, 3 Cal.5th at p. 176.) This requirement is satisfied if the record shows the defendant is aware that the waiver applies to guilt, special circumstances, and penalty.  It does not require a separate enunciated waiver by the defendant.  (*Ibid*.)  In *Sivongxxay*, we held that the statute was violated where "the term 'special circumstance' was never mentioned at all" during the waiver colloquy.  (*Id.* at p. 178.)

Here, by contrast, the trial court told Morelos that he was entitled to "12 individuals to make the factual determination both as to your guilt and in the event that that jury would find you guilty *and determine one or more special circumstance to be*

*true*, that you would have a constitutional right to a jury to determine the penalty for which the crimes would be punishable." This express reference to a jury finding on the special circumstance allegations shows that Morelos was "aware that the waiver applie[d] to each of these aspects of trial." (*People v. Diaz* (1992) 3 Cal.4th 495, 565; accord, *People v. Weaver* (2012) 53 Cal.4th 1056, 1075 (*Weaver*); *People v. Wrest* (1992) 3 Cal.4th 1088, 1103–1104.) There was no need for a separate interrogation about the special circumstance jury trial rights. (*Wrest*, at p. 1105.)

### H. Fundamental Fairness, Reliability, and Eighth Amendment Standards

Morelos presents several arguments challenging the fairness and reliability of his capital trial and sentence and asserts that his conviction, death eligibility finding, and death verdict must be reversed. These arguments largely restate Morelos's prior challenges to the trial court's rulings under a more general unfairness rubric. Specifically, Morelos contends that because he lacked two necessary protections in the criminal justice system — defense counsel and a jury — the adversarial process broke down and his trial failed to satisfy due process standards, as well as the state's independent interest in the fairness, integrity, and heightened reliability of capital proceedings. However, having concluded Morelos validly exercised his right to self-representation and waived his right to a jury trial, as well as his right to remain silent, these claims similarly fail.

"Ordinarily, criminal defendants may waive rights that exist for their own benefit. 'Permitting waiver . . . is consistent with the solicitude shown by modern jurisprudence to

the defendant's prerogative to waive the most crucial of rights.' " (*Cowan v. Superior Court* (1996) 14 Cal.4th 367, 371.)

Morelos broadly asserts that he could not waive his right to due process and a fair trial, nor could he waive the "interest of the justice system and community in reliable punishment." However, he did not do so. As explained *ante*, the trial court ensured a valid waiver of his right to counsel and to a jury trial. We have recognized that "[t]he tension between the right of self-representation and the interest in ensuring a fair trial was a matter of dispute in *Faretta* itself, and it persists to this day. The rule announced by the *Faretta* majority, however, remains the law of the land. [Citation.] This court, of course, may not adopt an alternative view of what the Sixth Amendment requires." (*People v. Butler* (2009) 47 Cal.4th 814, 824, fn. omitted.) Having knowingly and intelligently chosen to exercise his constitutional right to self-representation and waived his right to a jury trial, Morelos cannot now complain that his choices compounded to deprive him of a fair trial.

Morelos claims "the prosecutor's work with [him] to shape his testimony in the prosecution's favor constituted misconduct and a due process violation." In Morelos's view, "the trial was a performance directed by the prosecutor" during which the prosecutor was permitted to present an untested, misleading view of the evidence. While Morelos concedes that the prosecutor was permitted to communicate with him, he asserts "the prosecutor went far beyond any permissible line regarding communication with a pro [se] defendant when he shaped appellant's inculpatory guilt phase testimony." As Morelos explains, the defense portion of the guilt phase began with him taking the stand and the following exchange:

"THE DEFENDANT:  Well, I'd like to let the prosecution question me.  We discussed yesterday that a line of questioning that we both more or less agreed on that would cover issues not already covered.

"THE COURT:  Well, he can only cross-examine you about things that you have testified to on direct.  Mr. Schon, you waive any question and answer format and let the defendant —

"THE PROSECUTOR:  Yes, I do.  And I'd like to state for the record Mr. Morelos discussed with me yesterday whether he wanted to testify.  I indicated it was up to him to testify.  I can't advise him of it.  But if he did testify, there are certain areas I would like to cover concerning the torture aspects of the case with him and various factors about the crime itself I would ask him questions about.  But his testifying is up to him.  Right, Mr. Morelos?

"THE DEFENDANT:  Yes, sir.

"THE COURT:  He can only cross-examine you on areas you covered in your direct.  He waived the formality of question and answer.  So narrative, if you just want to tell us what you want to tell us, that's fine with me."

Morelos then began his narrative testimony, describing, inter alia, his  intent to inflict "great bodily pain" upon Anderson, his "intent to kill" Anderson, and clarifying that he "raped" Anderson using "extreme force" even though he had previously told police that he and Anderson had consensual sex.

Morelos claims that, "although the exact contents of the discussion between appellant and the prosecutor the day before appellant testified are unknown, the impact of the discussion was to lighten the prosecution's burden of proof at the guilt

phase." Morelos points to the distinctions between his pretrial admissions to police and his trial testimony, asserting that such changes were meant to fill evidentiary gaps identified by the prosecution.

"While a pro se litigant may divide the duties or representation as would any other lawyer, she may not insulate herself from contact by the court or adversary counsel." (*McMillan v. Shadow Ridge at Oak Park Homeowner's Assn.* (2008) 165 Cal.App.4th 960, 967.) Thus, the prosecutor did not commit misconduct by engaging with Morelos the day before he took the stand. Notably, Morelos admits to otherwise initiating communication with the prosecutor. On the day in question, it was arguably necessary for Morelos and the prosecutor to confer about some of the unique logistics that can arise when a self-represented defendant testifies in his or her own defense. For instance, a conversation between the prosecutor and Morelos about Morelos testifying in narrative form could have benefitted Morelos, and Morelos fails to establish misconduct based on his mere communication with the prosecutor. Moreover, Morelos does not show that any alleged overstepping by the prosecutor affected his decision to waive his right against self-incrimination. The prosecutor told the trial court that "Morelos discussed with me yesterday whether he wanted to testify" and "I indicated it was up to him to testify." There is nothing from the exchange to indicate that the prosecution acted improperly. Indeed, to the contrary, the prosecutor repeatedly stated that he had advised Morelos that he could not give him legal advice as to whether to testify and that the decision to testify was up to Morelos and then asked him to confirm the same on the record, which he did. Having made the choice to testify, Morelos was free to admit guilt during his trial testimony. (*Bloom, supra,*

48 Cal.3d at p. 1222.) On this record, Morelos's accusations of prosecutorial misconduct prove unpersuasive.

Morelos also accuses the prosecutor of presenting "incomplete, misleading testimony regarding the marks on the victim's genitals, which was relevant to the torture special circumstances." He points out that, at the preliminary hearing, Dr. Pakdaman testified on direct examination that bruise marks on Anderson's genitals were partially "superimposed by . . . postmortem lividity," meaning the natural pooling of blood that occurs after death. During cross-examination at the preliminary hearing by then-appointed defense counsel, Dr. Pakdaman conceded it was difficult to decipher how many of the genital markings were caused by bruising versus lividity; "there is some bruising plus lividity, which are sort of mixed." At Morelos's bench trial, the prosecutor elicited similar testimony regarding the bruising on Anderson's genitals, explaining that bruising "is usually discoloration of the skin while an individual is alive," but Dr. Pakdaman provided no testimony regarding lividity. The prosecutor's trial questions focused on the "extensiveness of the bruising in relation to the pain."

Morelos argues that the prosecutor's selective questioning presented an impermissibly "misleading version of the facts" that was central to the torture-murder special-circumstance allegation.

Morelos did not object to the prosecutor's questioning of Dr. Pakdaman regarding the bruising on Anderson's genitals. As a general rule, a defendant waives a claim of prosecutorial misconduct absent a timely and specific objection unless an objection would be futile. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) Nevertheless, Morelos's claim lacks merit. The

prosecutor's examination of Dr. Pakdaman regarding bruising did not constitute prosecutorial misconduct. Dr. Pakdaman's testimony that bruising was evident on Anderson's genitalia was neither false nor misleading; it was entirely consistent with his preliminary hearing testimony. The prosecutor did not commit misconduct by failing to explore *how many* of the genital markings were caused by bruising versus lividity. Morelos, like his counsel at the preliminary hearing, was free to question Dr. Pakdaman about lividity to fill in any perceived evidentiary gaps or inconsistencies for the trial court.

Morelos faults the trial court for not sufficiently maintaining a fair, adversarial trial process at both the guilt and penalty phases, allowing Morelos's "testimony to become a free-for-all," but this claim also fails. He claims the trial court should not have permitted the prosecution to ask Morelos leading questions on cross-examination because Morelos was essentially a prosecution witness. (See Evid. Code, §§ 767, subd. (a) [except under "special circumstances," leading questions may only be asked on cross-examination], 773, subd. (b) ["The cross-examination of a witness by any party whose interest is not adverse to the party calling him is subject to the same rules that are applicable to the direct examination"].) However, when questioned by the prosecution, Morelos was being cross-examined. The fact that he provided testimony favorable to the prosecution did not convert him into a nonadverse party. As stated, during the defense case, Morelos was free to waive his right against self-incrimination and testify in incriminating narrative form; the fact that he did so did not deprive the prosecution of its right to ask him leading questions on cross-examination.

Morelos contends the procedural requirements articulated in *Bloom*, *supra*, 48 Cal.3d 1194 were not met and his convictions and sentence must be overturned as unconstitutionally unreliable. In *Bloom*, the defendant opted to represent himself during the penalty phase and urged the jury to return a death verdict. (*Id.* at pp. 1215–1216, 1218.) On appeal, he argued in part that the failure to present mitigating evidence during the penalty phase, combined with his personal request for a death verdict, "offended the state's interest in ensuring the reliability of capital penalty determinations." (*Id.* at p. 1218.) We rejected the argument. We observed that "[t]he threat of appellate reversal would be not merely ineffective but counterproductive" under these circumstances. (*Id.* at p. 1227.) "A knowledgeable defendant desiring to avoid the death penalty could make a timely request for self-representation under *Faretta, supra*, 422 U.S. 806, and then decline to present any mitigating evidence at the penalty phase, secure in the knowledge that any death judgment would be reversed by this court, while a defendant genuinely desiring death could circumvent the rule by presenting a bare minimum of mitigating evidence." (*Ibid*.) Instead, "the required reliability is attained when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present. A judgment of death entered in conformity with these rigorous standards does not violate the Eighth Amendment reliability requirements." (*Id.* at p. 1228.)

59

Morelos does not meaningfully distinguish his defense strategy during the guilt and penalty phases from the defendant's penalty phase strategy in *Bloom* and we therefore reject his assertion that his trial lacked the procedural protections required by *Bloom*. While Morelos represented himself throughout his trial and testified during both the guilt and penalty phases, providing incriminating details of his crimes, it was within his rights to do so. As we stated in *Bloom*, a court cannot compel a defendant to put on mitigating evidence. (*Bloom*, *supra*, 48 Cal.3d at p. 1227.) Moreover, Morelos's strategy did not ensure the outcome of his trial nor compromise the trial court's duty to hold the prosecution to its burden of proof. The court was free to reject Morelos's testimony and did so, in part. Before announcing its penalty verdict, the trial court noted that it "sought guidance from the California Supreme Court in the case of *People versus Bloom* that can be found at 48 Cal.3d 1194." The trial court thereafter refused to consider prior offenses Morelos claimed to have committed that could not be proved by independent evidence. On this record, like in *Bloom*, the required reliability was obtained at both the guilt and penalty phases of Morelos's trial.

In contending his trial was an unreliable "empty charade," Morelos also points to the fact that he was denied advisory counsel and the court characterized his trial as a "slow plea." However, we have determined that the denial of Morelos's request for "assistant counsel" did not affect the outcome of his trial. And we have rejected Morelos's claim that the trial proceedings amounted to a slow plea in violation of section 1018. This derivative claim is made no more persuasive by its reframing.

## I. Meaningful Review of the Penalty Determination

Morelos contends his death sentence must be vacated because he was denied independent review of the penalty verdict. He insists that we must read into section 190.4, subdivision (e) "a mechanism for independent review of a trial court's penalty verdict and remand this case so that the review can take place, or the Court must declare the California statute unconstitutional as applied to cases in which a jury trial has been waived." According to Morelos, to satisfy due process standards, a second judge must review the sentencing judge's penalty verdict. Furthermore, if section 190.4, subdivision (e) is read not to apply to judge-sentenced defendants, Morelos contends it unconstitutionally deprives him of equal protection of the laws.

Under section 190.4, subdivision (e), when a verdict of death has been rendered, "the defendant shall be deemed to have made an application for modification of such verdict or finding . . . . In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings." "[T]his court and the United States Supreme Court have cited the provisions of section 190.4, subdivision (e), as an additional safeguard against arbitrary and capricious imposition of the death penalty in California." (*People v. Lewis* (2004) 33 Cal.4th 214, 226.)

At the conclusion of the penalty phase of Morelos's trial, the trial court detailed its findings as to each factor relevant to a penalty determination of death enumerated in section 190.3. (See § 190.3, factors (a)–(k).) The court then determined the "factors in aggravation substantially outweigh the factors in mitigation." As such, the court determined the penalty should be death. The court thereafter explained to Morelos his right to file a motion for a new trial and his right to move to modify the judgment. The court then set a date for any such motions. At the subsequent proceedings, the trial court addressed Morelos as follows, "This is the time if you so desire that you could make a motion for the court to reconsider the weighing of the factors in aggravation against the factors in mitigation. Do you wish the court to do that?" Morelos answered "No," and the court proceeded to sentencing without objection.

Morelos's claims are similar to those we rejected in *Weaver, supra*, 53 Cal.4th 1056. In *Weaver*, before accepting a jury trial waiver, the trial court advised the defendant that he would not be entitled to a modification hearing under section 190.4. (*Id.* at p. 1090.) The defendant indicated he understood. (*Ibid.*) After imposing a penalty of death, the trial court, out of " 'an abundance of caution' " conducted a hearing under section 190.4, reviewing the mitigating and aggravating evidence but declining to modify the verdict. (*Id.* at pp. 1090–1091.) We were unpersuaded by the defendant's claim that he did not receive a proper hearing under section 190.4, subdivision (e).

First, we determined that the *Weaver* defendant forfeited his statutory claim by failing to object at trial. (*Weaver, supra*, 53 Cal.4th at p. 1091.) We nevertheless proceeded to reject his argument on the merits. We pointed out that " ' "[w]e have never decided whether a defendant who waives a jury trial on

the issue of penalty is entitled to a modification hearing under section 190.4, subdivision (e)." ' [Citation.]. . . . In *Horning*, the trial court had given a detailed statement of reasons for its penalty phase verdict, and we observed that '[n]othing in section 190.4 suggests the court must state its reasons twice.' " (*Ibid.*, quoting *People v. Horning* (2004) 34 Cal.4th 871, 912 (*Horning*).) Since the trial court in *Weaver* stated its reasons twice, there was no conceivable error. (*Weaver,* at p. 1091.) Nor did the *Weaver* defendant persuade us "that because section 190.4, subdivision (e), does not logically apply to a court trial, the California death penalty scheme is 'unconstitutional in that it fails to provide a mechanism for an independent review of a trial court's penalty phase verdict.' " (*Ibid.*) Observing that the defendant cited no supportive authority, we declined to conclude that a defendant who waives a jury trial has a constitutional right to independent review of the court's verdict. (*Ibid.*) In sum, the *Weaver* defendant made the decision to waive a jury and forgo a section 190.4 hearing; "[p]ermitting him to make that decision did not violate his rights." (*Id.* at p. 1091.)

Morelos, like the defendant in *Weaver*, waived any claim of error under section 190.4 by expressly refusing the trial court's offer to review its penalty verdict. (See *Weaver, supra,* 53 Cal.4th at p. 1091; see also *Horning, supra,* 34 Cal.4th at p. 912.) Indeed, Morelos acknowledges that we have previously deemed such claims of error under section 190.4 waived by the failure to object. As for Morelos's constitutional claim, we are not persuaded that independent review of his penalty verdict at the trial court level was constitutionally mandated by due process or equal protection principles. Like in *Weaver*, Morelos "cites no authority holding that a defendant who waives a jury has a constitutional right to an independent review of the court's verdict." (*Weaver*, at p. 1091.)

Moreover, the trial court clearly stated its reasons for Morelos's penalty phase verdict on the record and Morelos fails to explain how an additional trial level review by a second judge would increase the reliability of his verdict, which is subject to our automatic review (§ 1239, subd. (b)).  Nor has Morelos shown that it is impermissible for the state to distinguish, for purposes of the review contemplated by section 190.4, subdivision (e), between a penalty determination rendered by a jury and one rendered by a judge.  Morelos shows no greater entitlement to relief than the defendant in *Weaver*.  Similar to the *Weaver* defendant, having validly waived his right to a jury trial and declined the trial court's offer to reconsider his penalty verdict, Morelos fails to persuade us that his rights were violated.  (*Weaver*, at p. 1091.)

### J.  California's Death Penalty Statute Does Not Violate the United States Constitution

Morelos offers several constitutional challenges to California's death penalty scheme, acknowledging that we have previously rejected them.  Morelos provides no persuasive reason for us to either reconsider our decisions in those cases or draw a sufficient distinction between the scope of those decisions and the facts in this case.  We reiterate our prior decisions.

Morelos asserts that the special circumstances contained in section 190.2 fail to meaningfully narrow the class of death-eligible murderers in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. This claim is meritless.  (See *People v. McDaniel* (2021) 12 Cal.5th 97, 155 (*McDaniel*); *People v. Steskal* (2021) 11 Cal.5th 332, 379; *People v. Capers* (2019) 7 Cal.5th 989, 1012–1013 (*Capers*); *People v. Ghobrial* (2018) 5 Cal.5th 250, 291 (*Ghobrial*).)  Nor does section 190.3, factor (a), permitting the sentencer to consider the "circumstances of the crime" when

making its penalty determination, result in the arbitrary and capricious imposition of the death penalty. (*McDaniel*, at p. 155; *Steskal*, at p. 379; *Capers*, at p. 1013; *Ghobrial*, at p. 291.)

Morelos contends his death sentence is unconstitutional because it did not require findings beyond a reasonable doubt, "not only that the factual bases for its decision are true, but that death is the appropriate penalty." " 'Neither the federal nor the state Constitution requires that the penalty phase jury find beyond a reasonable doubt that aggravating factors outweigh mitigating factors before determining whether or not to impose a death sentence,' and the United States Supreme Court's Sixth Amendment jurisprudence, including *Apprendi* [*v. New Jersey* (2000)] 530 U.S. 466, does not demand such a requirement. (*People v. Parker* (2017) 2 Cal.5th 1184, 1232 [218 Cal.Rptr. 3d 315, 395 P.3d 208].)" (*Ghobrial, supra*, 5 Cal.5th at pp. 291–292.) Moreover, the death penalty statute is not unconstitutional because " 'it does not require . . . findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence.' " (*People v. Dalton* (2019) 7 Cal.5th 166, 267; see also *McDaniel, supra*, 12 Cal.5th at pp. 155–156.)

Contrary to Morelos's arguments, as we have repeatedly stated, intercase proportionality review is not constitutionally required in capital cases. (*McDaniel, supra*, 12 Cal.5th at p. 157; *Capers, supra*, 7 Cal.5th at pp. 1016–1017; *Ghobrial, supra*, 5 Cal.5th at p. 293.) Nor does California's death penalty scheme violate equal protection principles by treating capital defendants and noncapital defendants differently. "Because capital defendants are not similarly situated to noncapital

defendants, California does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants that are not provided to capital defendants." (*People v. Jones* (2012) 54 Cal.4th 1, 87 (*Jones*); see also *McDaniel*, at p. 157.)

Finally, Morelos's allegation that California's use "of the death penalty as a regular form of punishment" violates international law is meritless. " 'California does not employ capital punishment in such a manner.' " (*Jones*, *supra*, 54 Cal.4th at p. 88; see also *McDaniel*, *supra*, 12 Cal.5th at p. 157; *Ghobrial*, *supra*, 5 Cal.5th at p. 293.)

## K. Newly Conferred Discretion on the Firearm and Serious Felony Enhancements

### 1. Senate Bill No. 620 (2017–2018 Reg. Sess.)

Morelos contends, and the Attorney General agrees, that Senate Bill No. 620 (2017–2018 Reg. Sess.) (Senate Bill No. 620), which was enacted after Morelos was sentenced, applies retroactively to his case.

On January 1, 2018, Senate Bill No. 620 became effective. (Stats. 2017, ch. 682, §§ 1 & 2.) The bill vested courts with authority to exercise their discretion to strike or dismiss firearm enhancements imposed under section 12022.5 (see § 12022.5, subd. (c), as amended by Stats. 2017, ch. 682, § 1). Prior to the enactment of Senate Bill No. 620, these enhancements were mandatory. (§ 12022.5, former subd. (c).)

We agree with the parties that a limited remand is appropriate to allow the trial court to consider its newly conferred discretion to strike Morelos's five-year section 12022.5, subdivision (a) firearm enhancement.

### 2. *Senate Bill No. 1393 (2017–2018 Reg. Sess.)*

Morelos similarly contends, and the Attorney General agrees, that Senate Bill No. 1393 (2017–2018 Reg. Sess.) (Senate Bill No. 1393) requires his case to be remanded so the trial court can consider whether to strike his two 5-year prior serious felony enhancements.

At the time Morelos was sentenced, the court was required under section 667, subdivision (a), to enhance the sentence imposed for conviction of a serious felony by five years for each qualifying prior serious felony conviction. On September 30, 2018, the Governor signed Senate Bill No. 1393 (effective January 1, 2019), amending sections 667, subdivision (a) and 1385, subdivision (b) (Stats. 2018, ch. 1013, §§ 1, 2) to permit a trial court to exercise discretion to strike or dismiss prior serious felony enhancements "in the furtherance of justice." (§ 1385, subd. (b)(1), as amended by Stats. 2018, ch. 1013, § 2.)

The Attorney General concedes that the amendments apply retroactively to Morelos's case. We agree with the parties that a limited remand is appropriate for the trial court to consider whether to exercise its recently conferred discretion.

### L. Prior Prison Term Enhancements

Morelos asserts, and the Attorney General concedes, that recently enacted Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill No. 136), which narrowed who is eligible for the one-year enhancement under section 667.5, subdivision (b), applies retroactively to his case. As stated, the court found that Morelos served one prior prison term for assault with a deadly weapon by means of force likely to produce great bodily injury within the meaning of section 667.5, subdivision (a), which provides for a three-year enhancement. The court also found Morelos to have

served a prior prison term for first degree burglary within the meaning of section 667.5, subdivision (b), which provides for a one-year enhancement. The court stayed punishment for these enhancements.

On October 8, 2019, the Governor signed Senate Bill No. 136, which amended section 667.5, effective January 1, 2020. (Stats. 2019, ch. 590, § 1.) Senate Bill No. 136 narrowed eligibility for the one-year prior prison term enhancement to those who have served a prior prison sentence for a sexually violent offense. (§ 667.5, subd. (b), as amended by Stats. 2019, ch. 590, § 1.)[4]

Morelos's prior prison term for first degree burglary was not for a sexually violent offense. (See Welf. & Inst. Code, § 6600, subd. (b) [defining "Sexually violent offense"].) Therefore, the parties agree, as do we, that Morelos's one-year prior prison term enhancement should be stricken.

However, the parties disagree over a related question. Namely, whether, if on remand the court again imposes the five-year section 667, subdivision (a) serious felony enhancement for the assault with a deadly weapon, the trial court must stay or strike the remaining three-year prior prison term enhancement stemming from the same offense. Since this question will only arise if the trial court declines to strike the serious felony enhancement at issue, we need not consider it at this time.

---

[4] Section 667.5 was amended again in 2021 (Stats. 2021, ch. 626, § 28), but those amendments have no bearing on the analysis of the issue before us.

## III.  DISPOSITION

For the reasons stated above, we vacate as unauthorized the one-year prior prison term enhancement imposed under former section 667.5, subdivision (b) and remand to the trial court for resentencing consistent with this opinion (see *ante*, pts. II.K. and II.L.).  Following resentencing, the trial court is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.  In all other respects, the judgment (including the judgment of death) is affirmed.

**GROBAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**JENKINS, J.**
**GUERRERO, J.**

PEOPLE v. MORELOS

S051968


Dissenting Opinion by Justice Liu


A trial court may not accept a criminal defendant's waiver of the constitutional right to a jury trial unless the waiver is "knowing and intelligent, that is, ' " 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " ' " (*People v. Collins* (2001) 26 Cal.4th 297, 305 (*Collins*); see U.S. Const., 6th Amend.; Cal. Const., art. I, § 16.) A reviewing court may uphold the validity of a jury trial waiver only " 'if the record *affirmatively* shows that it is voluntary and intelligent under the totality of the circumstances.' " (*Collins*, at p. 310, italics added.) Applying these standards, I cannot conclude on the record before us that defendant Valdamir Fred Morelos validly waived his right to a jury trial in this capital case. I respectfully dissent from today's affirmance of the judgment.

**I.**

The record before us presents three significant concerns. The first is the spare nature of the waiver colloquy. We have emphasized "the value of a robust oral colloquy in evincing a knowing, intelligent, and voluntary waiver of a jury trial." (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 169 (*Sivongxxay*).) And we have urged trial courts to "advise a defendant of the basic mechanics of a jury trial in a waiver colloquy, including but not necessarily limited to the facts that (1) a jury is made up of 12 members of the community; (2) a defendant through his or

1

her counsel may participate in jury selection; (3) all 12 jurors must unanimously agree in order to render a verdict; and (4) if a defendant waives the right to a jury trial, a judge alone will decide his or her guilt or innocence." (*Ibid*.) It is true that we have not insisted on a rigid rubric of advisements, nor have we required advisement of every one of these four points in order to uphold a jury trial waiver. But the record in this case is so devoid of meaningful advisement that there is no sound basis to infer — much less any "affirmative[]" indication (*Collins*, *supra*, 26 Cal.4th at p. 310) — that Morelos knowingly and intelligently waived his right to a jury trial.

At a hearing on August 11, 1995, after a discussion among the prosecutor, Morelos, and Judge Ball regarding the jury waiver, Judge Ball said the case would be reassigned to Judge Creed because Judge Ball was unwilling to accept a jury waiver for both the guilt and penalty phases. Judge Ball then engaged Morelos in a waiver colloquy. Judge Ball told Morelos that he had a right to a jury of 12 individuals, but he did not explain that the jurors had to be unanimous, that Morelos would participate in jury selection, and that the jurors would be selected from members of the community. He did not explain that without a jury, Judge Creed alone would make all determinations about Morelos's guilt, special circumstances, and penalty. Judge Ball then accepted Morelos's waiver.

Once the matter was reassigned to Judge Creed, Judge Creed confirmed Morelos's waiver. Judge Creed did not explain any features of a jury trial. He merely confirmed that Morelos knew he had an "absolute constitutional right" to a jury and that he understood that right. After the guilt phase, Judge Creed again confirmed that Morelos did not want to empanel a jury for the penalty phase but again did not explain the jury right.

These three colloquies — one with Judge Ball and two with Judge Creed — were more lacking in substance, either individually or collectively, than any colloquies we have considered in upholding a jury trial waiver. In *People v. Weaver* (2012) 53 Cal.4th 1056 (*Weaver*), the defendant waived his right to a jury trial by completing a written waiver explaining that the court would determine the defendant's guilt or innocence and that if the court found the defendant guilty and found a special circumstance to be true, the court would determine the appropriate penalty. (*Id.* at p. 1070.) In court, the trial judge again explained that he alone would determine " 'all legal findings,' " including the special circumstance. (*Ibid.*) He further emphasized that the defendant had a right to a unanimous jury. (*Ibid.*) We held that the defendant's waiver was knowing and intelligent, even though the defendant was not expressly advised of his right to participate in jury selection.

In *People v. Cunningham* (2015) 61 Cal.4th 609 (*Cunningham*), the defendant waived his right to a guilt phase jury trial. (*Id.* at p. 636.) The trial judge informed the defendant of his right to a unanimous jury and that in the absence of a jury, the judge alone would make a determination of guilt or innocence. (*Ibid.*) He further advised the defendant that "it could be easier for the prosecution to convince only one person, as opposed to 12." (*Ibid.*) We held that this waiver was knowing and intelligent and that the trial court's colloquy was "a full explanation . . . of the right and the consequences of the waiver." (*Id.* at p. 637.)

In *Sivongxxay*, the defendant waived his right to a jury at a pretrial hearing. (*Sivongxxay*, *supra*, 3 Cal.5th at p. 164.) The trial judge informed the defendant that he had a right to a trial by jury, that the jury would be made up of 12 members of the

community, that he would participate in the selection of the jury, and that the judge would determine his guilt or innocence and any penalty in the absence of a jury. (*Id.* at p. 167.) We held that this colloquy was sufficient and that it was not necessary to inform the defendant of the unanimity requirement. (*Id.* at p. 168.) The court also held that the trial judge's failure to specifically mention that the judge would determine the presence of special circumstances did not make the defendant's waiver invalid. (*Id.* at p. 171.) "There is no additional constitutional requirement that a defendant be specifically advised of the specific charges, enhancements, allegations, or other issues to which a general jury waiver will apply." (*Ibid.*; but see *id.* at p. 206 (conc. & dis. opn. of Liu, J.); *id.* at p. 219 (conc. & dis. opn. of Cuéllar, J.).)

In *People v. Daniels* (2017) 3 Cal.5th 961 (*Daniels*), the defendant sought to waive his right to a jury trial at the guilt and penalty phases of trial. (*Id.* at p. 986 (conc. & dis. opn. of Cuéllar, J.).) The trial judge engaged the defendant in a colloquy explaining that he would determine the defendant's guilt or innocence, the presence of special circumstances, and the penalty. (*Id.* at pp. 987–989.) The defendant repeatedly, even emphatically, affirmed his intent to waive a jury trial. (*Id.* at p. 995.) However, the trial judge never explained that a jury is made up of 12 members of the community, that the jury must be unanimous, or that the defendant would have the right to participate in jury selection. (*Id.* at p. 994.). We upheld the jury waiver with respect to the guilt phase but not with respect to the penalty phase. (*Id.* at pp. 966–967 (per curiam).)

In this case, neither Judge Ball nor Judge Creed informed Morelos that he could participate in jury selection, that the jury must be unanimous in order to render a verdict, or that a judge

alone would decide his guilt and the appropriate penalty in the absence of a jury. At the very least, the record of advisement here leaves as much doubt about the validity of the waiver as the record in *Daniels*, where we refused to uphold the waiver with respect to the penalty phase. Even if it were true that "[t]he waiver colloquy here was . . . more substantial than in *Daniels*" (maj. opn., *ante*, at p. 50), that is not saying much. (Cf. *Daniels*, *supra*, 3 Cal.5th at p. 994 (conc. & dis. opn. of Cuéllar, J.) ["The court did not, prior to accepting the waiver, elaborate on what a jury trial entails, other than that it is not the same thing as a trial before a judge. The court did not explain anything about the nature of the jury — for example, what constitutes a jury, how a jury is selected, or that jury members must be impartial and their verdict unanimous."].) Whatever daylight there is between *Daniels* and this case, the colloquies here, as in *Daniels*, leave us in the dark as to whether Morelos's jury trial waiver was knowing and intelligent.

Second, Morelos was self-represented. In prior cases, the role of counsel has played an important role in our analysis. In *Weaver*, the defendant was represented by counsel and stated on the record that his attorney had explained the meaning of a jury trial versus a court trial. (*Weaver*, *supra*, 53 Cal.4th at p. 1070.) One of his attorneys explained that they had discussed the jury waiver for "about two hours" the day before. (*Id.* at p. 1071.) And the trial judge gave the defendant "ample time . . . to discuss [the jury waiver] with counsel." (*Id.* at p. 1075.) We held that "the court and defense counsel fully explained to defendant what he was waiving." (*Id.* at p. 1074.) Similarly, the defendant in *Cunningham* was represented by counsel and had discussed the jury waiver with counsel. (*Cunningham*, *supra*, 61 Cal.4th at p. 636.)

In *Sivongxxay*, the defendant was represented by counsel, although there was no evidence that the defendant ever discussed his jury waiver with counsel. (*Sivongxxay*, *supra*, 3 Cal.5th at p. 205 (conc. & dis. opn. of Liu, J.).) Nevertheless, this court considered the mere fact that the defendant was represented by counsel as one of the circumstances that confirmed that the defendant's waiver was knowing and intelligent. (*Id.* at p. 173, fn. 8.)

In *Daniels*, the defendant was not represented by counsel at the time of his jury waiver, nor did he have any conversations with any counsel about his waiver. (*Daniels*, *supra*, 3 Cal.5th at p. 997 (conc. & dis. opn. of Cuéllar, J.).) This was a relevant factor in the ultimate determination that the defendant did not knowingly and intelligently waive his right to a penalty phase jury trial. (See *id.* at p. 1029 (conc. opn. of Kruger, J.); see also *id.* at p. 1024 (conc. & dis. opn. of Corrigan, J.) [noting that lack of counsel is "undoubtedly . . . relevant" because counsel "may explain the features of a jury trial, the nuances of jury selection, how a jury is likely to view the facts of the case, and the possibility of a mistrial"].) While a jury waiver is not automatically presumed valid because a defendant has counsel, lack of counsel is "one less assurance that [the defendant underst[ands] the nature of the right he [is] relinquishing and the effects of doing so." (*Id.* at p. 997 (conc. & dis. opn. of Cuéllar, J.).)

Here, as in *Daniels*, the trial judges did not ask whether Morelos ever received any information about waiving his jury right. (See *Daniels*, *supra*, 3 Cal.5th at p. 1029 (conc. opn. of Kruger, J.); *id.* at p. 997 (conc. & dis. opn. of Cuéllar, J.) ["we decline the People's invitation to speculate as to possible discussions with counsel which would have had no bearing on

6

decisions made or topics even mentioned on the record during the course of counsel's representation"].) Morelos's lack of counsel makes it even more concerning that the waiver colloquies were so devoid of substance.

To be sure, a defendant's independent legal knowledge is relevant, and Morelos had experience with the criminal justice system and "exhibited some legal knowledge" in his filings in this case. (Maj. opn., *ante*, at p. 51.) But in our past cases, there was evidence that the defendants had heard express explanations of their right to a jury in previous encounters with the criminal justice system. (*Daniels*, *supra*, 3 Cal.5th at p. 1023 (conc. & dis. opn. of Corrigan, J.) [prior explanation of the unanimity requirement]; *Sivongxxay*, *supra*, 3 Cal.5th at p. 167 [prior written jury waiver].) Here, there is no evidence of what Morelos was told about his jury rights in his prior cases. There is no evidence that he was ever adequately informed of the nature of the jury trial right in any of his prior prosecutions. While he did enter guilty pleas in past cases, those pleas were eight and 14 years before the jury waiver in this case.

Third, I am concerned about the extent to which the prosecutor drove the process of presenting the issue of jury waiver to the court. The prosecutor initially brought up the idea of proceeding with a court trial, saying he had spoken with Morelos and that they "would be likely to waive jury." The prosecutor asked Morelos if that was his understanding, and Morelos responded without elaboration that it was. When the trial judge expressed hesitation as to the penalty phase jury waiver, the prosecutor pushed back, saying he preferred a court trial on both phases to avoid going through voir dire with a pro se defendant. At the following hearing, the judge asked whether the parties intended to pursue a court trial, and the prosecutor

again responded in the affirmative and inquired about having the case reassigned. Aside from his comment confirming the prosecutor's first statement, Morelos did not participate in these conversations, although he was present.

Today's opinion says this case is unlike *Daniels*, where "it was the judge who introduced the idea of a jury trial waiver." (Maj. opn., *ante*, at p. 49.) But how does the fact that the waiver here was prosecutor-driven instead of "judge-driven" (*ibid.*) in any way suggest it was knowing and intelligent?

The only other case of which I am aware in which the record shows the prosecutor made the first reference to proceeding with a court trial is *Cunningham*. However, the record there was not clear whether the prosecutor had been the first to raise the idea of proceeding without a jury; the prosecutor only stated that "he had discussed with defense counsel the possibility of having a bench trial for the guilt phase." (*Cunningham, supra*, 61 Cal.4th at p. 636.) Notably, defense counsel confirmed this and brought the issue up again, unprompted, at a later hearing after speaking to the defendant and obtaining a written jury waiver. (*Ibid.*) Then, at a third hearing, the trial judge asked the defendant to further confirm his intent to waive a jury for the guilt phase. (*Ibid.*) The defendant did so and confirmed that he had discussed the matter with his attorney. (*Ibid.*) Only then, and after engaging the defendant in a colloquy, did the trial judge accept the defendant's jury waiver. (*Ibid.*) Even if the prosecutor initially raised the issue, the repeated confirmations by both defense counsel and the defendant, along with the defendant's conversations with counsel and the relatively thorough colloquy, made the prosecutor's initial suggestion less of a concern.

The prosecutor in this case was far more involved and insistent in seeking a court trial. The prosecutor pursued this topic through multiple preliminary hearings, actively offered justifications for a court trial instead of a jury trial, and even proposed that the case be reassigned to a different trial judge who would be less hesitant to proceed with a full court trial. The prosecutor's desire to avoid going through jury selection with a self-represented defendant has no bearing on whether Morelos's waiver was informed; it simply suggests the prosecutor, not Morelos, was determined to have a court trial. It is true that Morelos appeared intent on pleading guilty, but the record indicates that it was the prosecutor, not Morelos, who drove the jury waiver process, to the point of getting the case reassigned to a different judge specifically for this purpose. The concern is not that Morelos was pressured into waiving a jury or that his waiver was involuntary. It is that "multiple conversations" between Morelos and a prosecutor intent on avoiding a jury trial (maj. opn., *ante*, at p. 47) provide no basis to infer that Morelos was properly informed about the nature of a jury trial.

## II.

In reaching a contrary holding, today's decision first looks to Judge Ball's waiver colloquy. (Maj. opn., *ante*, at p. 43.) But that colloquy is threadbare. At an August 11, 1995 hearing, Judge Ball said the following: "Now, you understand that you have an absolute constitutional right to a trial by a jury. In other words, 12 individuals to make the factual determination both as to your guilt and in the event that that jury would find you guilty and determine one or more special circumstances to be true, that you would have a constitutional right to a jury to determine the penalty for which the crimes would be punishable. Now, that's been explained to you and you

9

understand that, correct?" Morelos answered in the affirmative. The court then asked, "In other words, you've made that decision freely and voluntarily based upon your own knowledge and understanding of the facts, and the law that's been explained to you and that you understand?" Again, Morelos answered in the affirmative.

That was the entirety of the advisement provided to Morelos. No other information was provided, and there was no other discussion about the mechanics of or right to a jury trial. Notwithstanding the extensive parsing of these colloquies in today's opinion (maj. opn., *ante*, at pp. 43–44), the sum total of the information Morelos received from the colloquies was that a jury is composed of 12 individuals who make a factual determination as to guilt and decide on the penalty. This, according to today's opinion, conveys "the core nature of a jury trial" (*id.* at p. 44) — never mind the requirement of jury unanimity, the defendant's right to participate in jury selection, the fact that jurors are chosen from members of the community, and the fact that waiving the jury means a judge alone would decide guilt and penalty.

The court suggests that Morelos agreed twice in that colloquy that the jury right had been explained to him and that he understood it. (Maj. opn., *ante*, at p. 43.) But the first of the two questions posed to Morelos — "Now, *that's* been explained to you and you understand *that*, correct" — refers to the information the court just provided. The second question — "In other words, you've made that decision freely and voluntarily based upon your own knowledge and understanding of the facts, and *the law that's been explained to you and that you understand*" — simply asked Morelos to confirm that he was entering his waiver based on whatever information had been

provided to him and whatever he may have understood about that information. It provides no indication of what information had been conveyed to Morelos and what, if anything, he understood about that information.

Second, the court notes that both Judge Ball and the prosecutor referred to jury selection in a prior hearing. (Maj. opn., *ante*, at p. 45.) Specifically, in the July 27, 1995 hearing at which the prosecutor introduced the idea of jury waiver, the prosecutor stated in Morelos's presence that a court trial was preferred to "avoid the necessity of going through voir dire on a jury with a pro per." In the next hearing, conducted August 2, 1995, Judge Ball made two passing references to jury selection, both in the context of calendar planning. First, he said, "I haven't discussed with you both scheduling and just when you perceive this matter would be ready for trial, and at what time, what stage juries would be impanelled and the attendant issues in terms of jury selection." Second, seven pages later in the reporter's transcript, Judge Ball spoke hypothetically about potential scheduling conflicts if no department was willing to take both a jury and penalty phase waiver and if he (Judge Ball) ultimately determined guilt and had to proceed to a penalty phase jury trial. In that context, Judge Ball said, "[T]hen the question would be the timing of the selection of the penalty phase jury." These two passing comments — made in two separate hearings that span more than 22 pages of transcript and address topics ranging from telephone access to scheduling — provide no meaningful information about how a jury is selected or Morelos's right to participate in that process.

Third, the court reaches back in time more than two years to observe that "Morelos's pretrial conduct and actions at trial made clear his desire to have his guilt and penalty adjudicated

11

expeditiously." (Maj. opn., *ante*, at p. 46.) But Morelos's interest in pleading guilty and his desire to avoid issues on appeal shed no light on what he understood about his right to have his guilt and penalty determined by a jury.

Fourth, the court notes that during the hearing on Morelos's *Faretta* motion, Morelos testified that he understood he had a right to a trial by jury, and he initialed his *Faretta* form to indicate that he so understood. (Maj. opn., *ante*, at p. 46; see *Faretta v. California* (1975) 433 U.S. 806.) At that hearing, the trial court said, "You understand that you have a right to a public, speedy trial and trial by a jury, you understand clearly that right?" Morelos replied, "Yes, sir." The preprinted form signed by Morelos said the following: "I understand that I have the right to a speedy and public trial and that is a right to a trial by jury." In addition, among the six pages of advisements concerning the rights and responsibilities of a self-represented litigant, Morelos initialed to indicate agreement with the following: "I understand that if I am permitted to represent myself, it will be necessary for me, WITHOUT THE ASSISTANCE OF COUNSEL, to conduct my own trial consisting of (but not limited to)," among other things, "Impanelment of jury" and "Preparing a presenting to the Court proposed jury instructions." Morelos attached a list of 11 cases with brief descriptions of how they relate to the right of self-representation, but neither the listed cases nor Morelos's brief descriptions address the jury trial right. Again, none of these facts provide any indication of what Morelos understood that right to entail.

Fifth, today's opinion speculates that Morelos must have discussed the jury right with his former attorneys during their two and a half years of representation, which ended less than a

month before he waived his jury right.  (Maj. opn., *ante*, at p. 47.)
The court refers to testimony from Morelos during the penalty
phase — after the trial court accepted his jury waiver — that he
" 'asked to waive jury trial' " and " '[t]hey — meaning his
attorneys — 'refused that.' "  (*Ibid.*)  Even if we credit this
testimony, which was not before the trial court at the time it
accepted his waiver, the record does not indicate — and it is
mere guesswork — what Morelos's former attorneys told him
about the jury trial right.

Sixth, the court asserts that the prosecutor told the court
that he and Morelos had "multiple conversations concerning
Morelos's desire to waive a jury." (Maj. opn., *ante*, at p. 47.)  The
record indicates that the prosecutor and Morelos spoke at least
three times in the weeks leading up to the waiver.  On July 21,
1995, the prosecutor informed the court, "Mr. Morelos has
already spoken to me, given me communication today, and I
think his wish is to have a court trial."  On July 27, 1995, the
prosecutor said,  "Well, I've talked to Mr. Morelos he called me
the day before yesterday in the afternoon hours.  We talked for,
what, about half an hour or so on the telephone, maybe longer.
We discussed various issues.  Mr. Morelos was interested in
pleading guilty to the guilt portion of the trial."  The prosecutor
then added, "Mr. Morelos and I have talked about this, and I
think we would be likely to waive jury on this case both as to the
penalty and guilt phase if that issue came up; is that correct,
Mr. Morelos?"  Morelos affirmed, without elaboration.  Then, at
a hearing on August 9, 1995, the prosecutor said, "What does
the file reflect on the time waiver?  Mr. Morelos talked about it
with me on the telephone this morning."  That is all we know
about these conversations.  The mere fact that the prosecutor
and Morelos discussed a jury waiver at various times provides

no basis to infer that the prosecutor adequately informed Morelos of what a jury trial entails.

Finally, the court suggests that "Morelos's jury waiver was contemplated over an extended period of time." (Maj. opn., *ante*, at p. 48.) I do not understand how this sheds any light on what Morelos knew about a jury trial.

## III.

In sum, I agree with today's opinion that Morelos was advised that a jury is comprised of 12 individuals who make a factual determination as to guilt and decide on the penalty. But whatever else Morelos knew about the substance of the jury right is loose conjecture. Where does the record in this case " '*affirmatively* show[] that [Morelos's waiver was] voluntary and intelligent under the totality of the circumstances' "? (*Collins*, *supra*, 26 Cal.4th at p. 310, italics added.) The record before us does not satisfy this standard. I fear that today's opinion, in concluding otherwise, once again lowers the bar for a valid waiver. (Cf. *Sivongxxay*, *supra*, 3 Cal.5th at p. 214 (conc. & dis. opn. of Liu, J.) ["We have never upheld a penalty phase jury trial waiver on a record of advisement as thin as the one here."].) One is left to wonder what set of circumstances, in light of the speculative inferences this court is willing to draw, could fall below the minimum required to show a knowing and intelligent waiver.

"For the average reader (or writer) of judicial opinions, it is perhaps elementary what a jury is and how it functions in a criminal trial. But we cannot assume such knowledge among the general populace . . . ." (*Daniels*, *supra*, 3 Cal.5th at p. 1007 (conc. & dis. opn. of Liu, J.).) Many studies have shown the troubling state of civic literacy in our nation, and "I would not

assume that despite these glaring gaps in civic literacy, the average American nonetheless has a clear understanding of the right to a jury trial." (*Id.* at pp. 1007–1008.) "The jury's role in a capital case is particularly likely to be unfamiliar. . . . The jury's normative function as sentencer in a capital trial is unusual and especially unlikely to be a matter of common understanding." (*Id.* at pp. 1008–1009.)

Because the record provides no indication that Morelos waived a jury trial " ' " 'with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it' " ' " (*Collins*, *supra*, 26 Cal.4th at p. 305), the judgment cannot stand. I respectfully dissent.

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Morelos

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S051968
**Date Filed:** August 11, 2022

_____

**Court:**  Superior
**County:**  Santa Clara
**Judge:**  Daniel E. Creed

_____

**Counsel:**

Michael J. Hersek and Mary K. McComb, State Public Defenders, under appointments by the Supreme Court, Kathleen M. Scheidel, Assistant State Public Defender, Sara Theiss and Caroline P. Cincotta, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris, Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael Farrell, Acting Chief Assistant Attorney General, Ronald S. Matthias and James William Bilderback II, Assistant Attorneys General, Glenn R. Pruden, Catherine A. Rivlin, Sarah J. Farhat and Alice B. Lustre, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Caroline P. Cincotta
Deputy State Public Defender
1111 Broadway, Suite 1000
Oakland, CA 94607
(510) 267-3300

Catherine A. Rivlin
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3850